# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-2420

———————

United States of America,

        Appellee,

v.

Ben J. Mullins,

        Appellant.

\* Appeal from the United States
\* District Court for the
\* Western District of Missouri.

———————

Submitted: December 13, 2005
Filed: May 1, 2006 (Corrected: 5/8/06)

———————

Before MELLOY, COLLOTON, and BENTON, Circuit Judges.

———————

COLLOTON, Circuit Judge.

Following a jury trial, Ben Mullins was convicted of unlawful possession of a firearm as a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1). The district court[1] also found that he was an armed career criminal under 18 U.S.C. § 924(e)(2)(B), and sentenced him to 240 months' imprisonment. Mullins appeals his conviction and his sentence, and we affirm.

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

## I.

On October 14, 2002, Jonathan Drackett, a student minister at the Calvary Temple Church in Springfield, Missouri, returned to his residence at the church. As he entered the church's fellowship hall, he overheard Ben Mullins using the telephone in the kitchen of the church. Not recognizing the voice, Drackett went to his apartment and called the church pastor. He asked the pastor to call the police, then armed himself with a golf club and went back downstairs to the fellowship hall. As Drackett entered the hall, the kitchen door opened, and Mullins walked out. Mullins asked Drackett not to call the police, and then began to run out of the hall, but stopped when the pastor arrived and called Mullins's name. Mullins pleaded with the two men not to call the police, and eventually sat down at a table in the hall. The police arrived a few moments later, and Drackett and the pastor saw Mullins take a gun from behind his back and place it on a chair, which he then slid under the table. The police recovered the gun, which was a Mondial Brevettata Model 1938 .22 caliber starter gun.

There was no dispute at trial that Mullins was a convicted felon, and the jury found that his possession of the starter gun was possession of a "firearm." Mullins argues that the starter gun is not a firearm within the meaning of 18 U.S.C. § 921(a)(3), so he was not prohibited from possessing it. He also contends that the district court erred in not granting a mistrial based on improper remarks made by the prosecutor during closing argument, in refusing to deliver a jury instruction requested by Mullins, and in allowing the testimony of the government's expert witness.

## II.

Mullins first contends that the evidence was insufficient to show that the starter gun met the statutory definition of a firearm. Under 18 U.S.C. § 922(g)(1), it is illegal for a convicted felon to possess in or affecting commerce any firearm. "Firearm" is

defined as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). Mullins argues that the government did not prove that the starter gun would expel a projectile, or that it could readily be converted to do so.

At trial, the government's expert witness, Richard Vasquez, a firearms enforcement officer of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") testified that he had examined the starter gun and found that it could readily be converted to expel a projectile. He testified that the gun could be converted by cutting off the barrel with a hack saw and opening up the cylinder holes with a Dremel tool. (T. Tr. at 43-44). According to Vasquez, it would take "easily less than an hour" to perform the conversion without any specialized knowledge, and that he personally could do it in "a matter of minutes if Murphy's law doesn't occur and everything goes right." (*Id*. at 62, 141).

Vasquez also testified that the firearms technology branch of the ATF had examined the same make and model of gun in 1968, and determined that the gun in question met the federal definition of firearm. (*Id.* at 42, 47). On cross-examination, however, Vasquez conceded that the evaluation in 1968 was based on a Mondial-Brevettata 1938 (999) "starter and tear gas gun," whereas Mullins's gun was described as a Mondial-Brevettata 1938 model .22 caliber "starter gun." (*Id*. at 56-57; *see also id*. at 102-03). Mullins contends that the evidence of the evaluation in 1968 is not probative, because the gun examined was not available for inspection, and because there was no evidence that the specimen gun was identical to Mullins's gun. He asserts that a "tear gas gun" likely had a barrel that was unobstructed, while the gun he possessed had a hardened pin obstructing the barrel. When questioned on this point, Vasquez said that the gun evaluated in 1968 was the "same model" as the gun seized from Mullins, and that it was "the frame of that starter pistol" that was "determined to be a firearm, not what is at the end of the barrel." (*Id*. at 56).

We conclude that Vasquez's expert testimony was sufficient to sustain the conviction. Vasquez is qualified as an expert in firearms. His experience included five years working at the firearms technology branch of the ATF, during which time he examined three starter guns, converted two starter guns to firearms, and instructed the conversion of two others. He spent three years as a firearms instructor and gunsmith at Dettmeyer Security Service, served more than a decade in the Marine Corps working as a small arms expert, and received specialized training at several gunsmith schools. (*Id*. at 38-39, 42, 45).

Vasquez visually inspected the specific gun possessed by Mullins. (T. Tr. at 43, 48, 61-62). Based on his examination, Vasquez "visually made a determination" that the gun could be converted to expel a projectile, without any specialized knowledge, in less than an hour, and in minutes by an expert. (*Id*. at 43, 62). He further rendered an opinion that the starter gun was a firearm as defined by federal law. (*Id*. at 44). A gun that can be modified in the amount of time described by Vasquez may be considered "readily convertible." *See United States v. Reed*, 114 F.3d 1053, 1056-57 (10th Cir. 1997) (upholding firearms conviction where the defense expert testified that the gun was workable after fifteen to twenty minutes of manipulation); *United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F.2d 463, 465 (2d Cir. 1971) (holding that starter guns that could be converted to fire live ammunition in twelve minutes or less are "readily convertible" under 18 U.S.C. § 921(a)); *see also United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (per curiam) (holding that a machine gun could be "readily restored to shoot" automatically as provided in 26 U.S.C. § 5845(b) when it would take an eight-hour day in a properly equipped machine shop).

We are not persuaded by Mullins's contention that the district court abused its discretion by allowing the government's expert testimony. Expert testimony is admissible "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has

applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Mullins's own expert agreed that visual examination was a proper method by which to determine whether a starter gun can readily be converted to a firearm, (T. Tr. at 87, 89), and we see no basis to conclude that the method used by Vasquez is unreliable. Although Vasquez did testify about the 1968 evaluation of a starter and tear gas gun by the ATF, his opinion about the Mullins starter gun was based on his independent visual examination of that particular gun. We find no abuse of discretion in admitting the expert testimony of Agent Vasquez, and the testimony was sufficient to support the conviction.

Mullins also argues that the jury may have convicted him based on a theory that the starter gun could function as a firearm "as is," because the residue expelled from the gun could be considered a projectile. This notion, which was advanced briefly by the prosecutor in closing argument, was based on testimony by Mullins's own expert that "people have been killed with starter pistols," and that "a famous actor a few years ago was killed with a starter pistol from the residue from the blank because it was so close to his head, went into a vital area and I believe perforated the rear and killed him." (T. Tr. at 125). Mullins contends that this evidence concerning the deadly expulsion of residue is insufficient as a matter of law to qualify his starter gun as a "firearm."

Even assuming the evidence was insufficient to show that the starter gun could expel a projectile without modification, that conclusion would not undermine the verdict. "When the district court submits to the jury two or more grounds for conviction, for one of which there was insufficient evidence, and it is impossible to tell on what grounds the jury decided the defendant's guilt, we cannot reverse the jury's general verdict of guilty." *United States v. Dreamer*, 88 F.3d 655, 658 (8th Cir. 1996); *see Griffin v. United States*, 502 U.S. 46, 49-50 (1991). Because there was sufficient evidence to support at least the conclusion that Mullins's starter gun could readily be converted to expel a projectile, the jury's general verdict may stand.

The Supreme Court's decision in *Griffin* also forecloses Mullins's challenge to the district court's refusal to give a requested jury instruction concerning sufficiency of the evidence. Mullins asked the court to instruct the jury that the starter gun was not a firearm in its existing condition, and that a finding of guilt could be based only on proof beyond a reasonable doubt that the gun could readily be converted to expel a projectile. The court instead read Jury Instruction Number 15, which set forth the essential elements of the charged offense, and defined the term "firearm" as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." This is a correct statement of the law. 18 U.S.C. § 921(a)(3).

In *Griffin*, the Court opined that "if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration." 502 U.S. at 60. At the same time, however, the Court held that "*the refusal to do so . . . does not provide an independent basis for reversing an otherwise valid conviction.*" *Id.* (emphasis added). Therefore, whether or not there was sufficient evidence to show that the starter gun was a firearm in its existing condition, the district court did not commit reversible error in declining to give the instruction proffered by Mullins. *United States v. Hanzlicek*, 187 F.3d 1228, 1235-36 (10th Cir. 1999); *United States v. Stone*, 9 F.3d 934, 937-42 (11th Cir. 1993).

## III.

Mullins next contends that he was denied a fair trial by improper comments made by the prosecutor during closing argument. The district court has broad discretion in controlling closing arguments, and we will not reverse absent an abuse of discretion. *United States v. Beckman*, 222 F.3d 512, 526 (8th Cir. 2000). To obtain a reversal based on prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct

prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. *Id*. If the remarks are improper, we determine whether they deprived the defendant of a fair trial by examining the cumulative effect of the misconduct, the strength of the properly admitted evidence of the defendant's guilt, and any curative actions taken by the trial court. *United States v. Holmes*, 413 F.3d 770, 774-75 (8th Cir. 2005). The relevant question ultimately is whether the prosecutor's comments, if improper, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

On appeal, Mullins claims that twelve statements made by the prosecutor during closing argument were improper. He objected to only one of these statements at trial, and we examine that point first.

During closing argument, the prosecutor addressed the fact that Mullins's starter gun was missing a firing pin, and that conversion of the gun to expel a projectile could be achieved only by aligning the chamber of the gun with the bore by hand, while looking down the barrel of the gun at the bullet. (T. Tr. at 89-92, 106-07). The defense expert implicitly suggested that because it would be dangerous to accomplish conversion in this manner, the gun could not readily be converted. Seeking to rebut this suggestion, and to illustrate that a person would not necessarily be dissuaded from converting the gun by the danger associated with the task, the prosecutor stated, "For a felon who has taken it upon himself to convert to a weapon and who is on his way to rob a gas station, they will really think – Do you think he is going to be scared to look down the barrel of this gun, to look and make sure it's ready to go?" (Closing Arg. Tr. at 5). Mullins objected, and the court overruled the objection. Mullins claims that this comment urged a conviction for matters not in evidence, was intended to inflame the jury, and was an improper appeal to the jury to convict to prevent future crimes.

We are not convinced that the disputed statement is improper. The prosecutor did not argue that Mullins was on his way to rob a gas station. The thrust of the argument was that because there are members of the criminal element who would not be deterred from converting the firearm to expel a projectile, the starter gun could "readily be converted." The government was not required to prove that Mullins himself intended to convert the starter gun, but only that the gun, as an objective matter, could readily be converted. Because the defense raised the point that it may be dangerous to align the components of the starter gun to expel a projectile, we think it was fair argument for the government to hypothesize situations in which the gun could and would readily be converted by a person in possession of the gun. We see no abuse of discretion in the district court's ruling on the objection.

Because there was no contemporaneous objection to the remaining comments raised on appeal, we review them in accordance with the plain error doctrine. To obtain relief, Mullins must show that there was an error, that is plain, and that affected his substantial rights. If all three conditions are met, we may exercise our discretion to correct a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 466-67 (1997). We bear in mind that fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers. Consequently, "[i]f an arguably improper statement made during closing argument is not objected to by defense counsel, we will only reverse under exceptional circumstances." *United States v. Eldridge*, 984 F.2d 943, 947 (8th Cir. 1993) (internal quotation omitted).

Mullins claims that the prosecutor made improper inflammatory statements, misstatements of the law, and remarks constituting improper vouching during closing arguments. While some of these remarks were phrased inartfully, and a few straddle

or cross the line of propriety, we conclude that when the comments are considered cumulatively and in the context of the trial, there is no plain error warranting relief.

Mullins contends that the prosecutor improperly stated that it is "[n]ot very often the government has two pastors from church come in to tell you about what a criminal did," and that "an ordinary person has no need to convert a starter pistol." (Closing Arg. Tr. at 3, 4). He also argues that it was improper for the prosecutor to say that "[t]he reason it's illegal for a felon to consider" converting a starter gun is "because felons are considered more dangerous than the average person." (*Id*. at 4).

It is improper for a prosecutor to make comments that are likely to inflame bias in the jury and to result in a verdict based on something other than the evidence. *United States v. Cannon*, 88 F.3d 1495, 1502-03 (8th Cir. 1996). But a prosecutor's obligation to seek justice rather than merely to win a case does not preclude him from offering a spirited statement of the grounds for conviction based on the evidence. "So long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury." *United States v. Robinson*, 110 F.3d 1320, 1327 (8th Cir. 1997).

Viewed in context, we believe the prosecutor's mention of the pastors in the church was a proper argument addressing the credibility of important witnesses in the case. *See United States v. Beaman*, 361 F.3d 1061, 1065 (8th Cir. 2004) (holding that a prosecutor referring to witnesses during closing argument as "two nice ladies" properly addressed the credibility of crucial witnesses). We note that Mullins's counsel argued the credibility of the defense expert even more directly, characterizing him as "an honorable, credible man," and even saying that "his testimony, I believe, showed you he is very honorable, very credible." (Closing Arg. Tr. at 10). *Cf. United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001) ("As a general rule, a prosecutor may not express a personal opinion about a defendant's veracity.").

The prosecutor's statement that an "ordinary person" has no need to convert a starter pistol was uttered in the context of the discussion about why the starter gun could readily be converted despite the purported danger of aligning the chamber. Again, we find no impropriety in the prosecutor explaining that because a felon, unlike an "ordinary person," cannot legally purchase a firearm, there are persons who would be willing to look down the barrel of the starter gun in order to convert it to a firearm.

The prosecutor's remark that Congress enacted 18 U.S.C. § 922(g)(1) because "felons are considered more dangerous than the average person" was beyond the evidence and the law, but we do not think it was prejudicial. He made the statement in the course of explaining that Congress prohibited felons from both possessing a functioning firearm and possessing "anything they can take into their workshop and convert to a gun." (Closing Arg. Tr. at 5). Perhaps the comment was designed to convince the jury that there was a good reason for the prohibition, so as to avoid the potential for jury nullification. In any event, the reference to "dangerous" felons was not aimed directly at Mullins, and such a brief passing comment in the context of a lengthy argument based on the evidence does not approach a plain error warranting relief.

Mullins next complains about an argument of the prosecutor, based on the testimony of the defense expert, that the potential for deadly expulsion of residue from a starter pistol means that the starter pistol constitutes a "firearm" without any conversion. Mullins points to the statements that "this gun does work and as such the defendant is guilty of this crime," and "I submit to you their expert told you, number one, this is a firearm as is." (Closing Arg. Tr. at 16, 17). He also notes that the prosecutor argued:

"Well, one man's residue is another man's really small projectile . . . .
Based on what their expert said, this weapon is good to go as is, don't

-10-

need to cut it, don't need to drill. Don't need to grind it. Don't even need real bullets according to what their expert said. Right now this gun, put a blank in it can kill you with residue. Well, the residue of a 22 caliber shell casing is called a bullet. Most people call that a projectile. They said that. They told you this gun as is is a firearm."

(Closing Arg. Tr. at 15-16).

We are doubtful about the merit of the prosecutor's argument, for it would seem to suggest that any starter pistol is a firearm. But we cannot meaningfully distinguish the *propriety* of this argument from any other potentially losing argument advanced by the government concerning the sufficiency of evidence to sustain a conviction. If the government argues that certain evidence shows that elements of an offense are satisfied, and the court later concludes as a matter of law that the evidence is insufficient, this does not mean that the prosecutorial argument was improper. It simply means that a conviction necessarily based on that argument about the evidence cannot stand. We already have explained why the government's argument based on the defense expert's testimony about the deadly expulsion of residue does not require reversal of the jury's general verdict. Given that the court properly instructed the jury on the elements of the offense, *see* Jury Instruction No. 15, and instructed the jury that arguments of counsel are not evidence, *see Lingar v. Bowersox*, 176 F.3d 453, 461 (8th Cir. 1999), there is no plain error warranting relief.

Mullins also argues that the prosecutor improperly vouched for the government's expert witness in various respects. Improper vouching occurs when a prosecutor refers to facts outside the record, implies that a witness's testimony is supported by facts not available to the jury, gives an implied guarantee of truthfulness, or expresses a personal opinion regarding witness credibility. *Beaman*, 361 F.3d at 1065. A prosecutor may not place the prestige of the government behind a witness. *United States v. Beasley*, 102 F.3d 1440, 1449 (8th Cir. 1996). The prosecutor must limit the closing argument to "the evidence and reasonable inferences that may be

-11-

drawn from it," although the prosecutor may use colorful language and argue "a personal interpretation of the evidence." *White*, 241 F.3d at 1023.

Mullins first complains that the prosecutor used the phrase, "I submit to you," to preface remarks during closing argument. We have said that use of this phrase is "a questionable practice because, depending on the context, it may either properly suggest how the jury should view the trial evidence, or improperly suggest that the government knows more than the jury has heard." *Beaman*, 361 F.3d at 1065. In *Beaman*, we found no plain error where the prosecutor, in the course of arguments that properly focused on the evidence, used the phrase eighteen times, while defense counsel used the phrase seven times. Likewise here, where the prosecutor used the phrase only three times and defense counsel used it once, we conclude that the arguments properly focused on the evidence at trial, and there was no plain error by the district court in failing to interrupt *sua sponte* to criticize the practice.

Mullins next contends the prosecutor improperly vouched when he said, "I took the gun down stairs and we fired this, bam." Mullins similarly complains that the prosecutor, after noting that the defense expert told the jury "it was difficult to remove the cylinder" of the starter gun, stated that "I am no strong man but it didn't take an expert to do that either." (Closing Arg. Tr. at 15). These comments were improper, because the prosecutor essentially testified as a witness concerning the test-firing of the starter gun, or the difficulty of removing the cylinder. *See King v. United States*, 372 F.2d 383, 394 (D.C. Cir. 1967); *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). In the context of the trial, however, we do not believe they constitute plain error warranting relief. The government's expert did test-fire the starter gun, (T. Tr. at 142), so the substance of the first argument was grounded in the evidence. We gather that the comment concerning the difficulty of moving the cylinder of the starter gun was based on a display of the evidence for the jury, and we see no prejudice from a comment concerning what the jury inevitably could determine for itself based on a physical examination of the evidence.

Mullins also claims the prosecutor impermissibly vouched for its expert witness. In one disputed comment, the prosecutor stated, "[a]nd you heard from two experts. You heard from Richard Vasquez who told you – and he wasn't here, he doesn't get paid extra if he finds a certain gun is a starter pistol or a firearm." (Closing Arg. Tr. at 4). Later in that section of the argument, the prosecutor contrasted the two expert witnesses:

> You are also going to be asked to consider the motivation for each of these two experts coming and testifying. The one expert is paid by the government. He is paid by the government not to wrongfully convict people. He is paid by the government to take a look at starter pistols, whether it's a criminal case like this or if someone at the factory wanted to know if their gun was going to be a starter pistol they could send one . . . .
>
> Their expert was paid quite a bit of money, fifty dollars an hour just to travel. He wouldn't have made that return trip if he found this was a firearm.

(Closing Arg. Tr. at 6).

These arguments are perhaps the most troubling. There was no evidence presented about how Mr. Vasquez was compensated, so while it would not be improper to point out that a witness has no bias due to financial incentives, the prosecutor failed to lay the foundation for that argument during his examination of the witness. The argument that Vasquez was "paid by the government not to wrongfully convict people" does not, as Mullins asserts, imply a guarantee of truthful testimony by the witness. Merely stating that the witness's job is to avoid wrongful convictions does not vouch to the jury that the witness is always correct or inherently credible. But again, the disputed comment does seek to address the witness's motives based on evidence not in the record. In describing his duties, Vasquez simply said that ATF agents "work for the public." (T. Tr. at 37). There was no evidence that the

-13-

government employs him to avoid wrongful convictions any more than it pays him to support aggressive prosecution of gun crime. Any public servant in law enforcement hopefully considers it part of his professional responsibility to avoid inculpating the innocent, but unless there is evidence to support a more specific assertion, a prosecutor ought not suggest to the jury that a law enforcement agent has a specialized duty to avoid wrongful convictions.

But while Mullins and his counsel now assert that these arguments constitute egregious violations of his right to a fair trial, there was no objection to the statements when they were made at the trial, and we ultimately conclude that the comments did not result in an unfair trial. The jury was presented with the testimony of competing experts, and it certainly was not improper for the prosecutor to point out potential biases of the defense expert. While some of the prosecutor's advocacy regarding the government's expert was problematic, we think it was evident to the jury that Mr. Vasquez was employed by the government, and that part of his job was to support the prosecution of criminal cases. There is no suggestion that he was paid on a contingency basis. We see no unfair prejudice from the comments sufficient to justify setting aside the conviction on plain error review.

Viewed in the context of the entire trial, we conclude that the prosecutorial comments to which Mullins now objects do not alone, or in combination, warrant a new trial. The jury was instructed that "[s]tatements, arguments, questions and comments by lawyers representing the parties are not evidence," (Jury Instruction Nos. 2, 11), and this instruction served to alleviate any risk of unfair prejudice. *Robinson*, 110 F.3d at 1326-27. The prosecutor's closing argument was based largely on evidence presented during the trial and reasonable inferences that could be drawn from it. None of the disputed comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

IV.

Mullins argues finally that the district court erred by enhancing Mullins's sentence based on facts of prior convictions that were neither proved beyond a reasonable doubt to a jury nor admitted by Mullins. This argument is foreclosed by existing precedent. *See, e.g.*, *Almendarez-Torres*, 523 U.S. 224, 240-47 (1998); *United States v. Strong*, 415 F.3d 902, 907 (8th Cir. 2005); *United States v. Bach*, 400 F.3d 622, 634 (8th Cir. 2005).

\*　　\*　　\*

The judgment of the district court is affirmed.

_____