# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3491

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Pascal L. Two Elk, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 10, 2008
Filed: August 5, 2008 (corrected August 13, 2008)

_____

Before LOKEN, Chief Judge, EBEL[1] and COLLOTON, Circuit Judges.

_____

EBEL, Circuit Judge.

A jury convicted Defendant-Appellant Pascal L. Two Elk of two counts of aggravated sexual abuse of A.R., a child under the age of twelve, in violation of 18 U.S.C. §§ 1153, 2241(c) and 2246(2)(A). On appeal, Two Elk alleges a series of

_____

[1]The Honorable David M. Ebel, Senior Circuit Judge, United States Court of Appeals for the Tenth Judicial Circuit, sitting by designation.

errors by the district court[2] that, in his estimate, deprived him of a fair trial. Alternatively, he challenges one aspect of the sentencing court's U.S. Sentencing Guidelines ("U.S.S.G.") calculations.

Two Elk first argues that his two-count Indictment was multiplicitous because both counts charged him with the same exact conduct. He requests a new trial on whichever count is left standing because the two-count Indictment hyperbolized his alleged offenses and thereby tainted the jury's deliberations on both counts.

Second, Two Elk challenges a series of the district court's evidentiary decisions. Specifically, he argues that the court erred in admitting four hearsay statements and also failed to ensure that medical testimony offered by the prosecution was reliable and relevant. Third, he takes issue with comments that the prosecutor made in his closing argument and a line of questioning the prosecutor took up with one of the defense witnesses. Two Elk contends that these errors, taken individually or cumulatively, deprived him of a fair trial.

Lastly – and, of course, alternatively – Two Elk asserts that the district court erred in applying a four-level enhancement for the use of force during the sexual act. He claims that the district court overreached in finding the factual predicates necessary for the enhancement and also argues that, even assuming the presence of those factors, the evidence did not warrant the enhancement.

We hold that: (1) the district court did not plainly err by entering a judgment of conviction on both counts of the Indictment; (2) the court did not commit reversible error in admitting certain hearsay statements; (3) the court did not admit expert testimony without a proper foundation; (4) the prosecutor's alleged misconduct does

---

[2]The Honorable Charles B. Kornmann, Judge, United States District Court for the District of South Dakota.

not necessitate a new trial; and (5) the court properly enhanced Two Elk's offense level pursuant to the use-of-force enhancement. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and affirm.

I.      **BACKGROUND**

     **A. Factual Background**

A.R. was born on April 10, 2003. A.R.'s mother, Carmelle Roach, often left A.R. and her twin brother S.R. with Francine Murphy, the wife of Roach's uncle, Ben Murphy, Sr. ("Ben Sr."). Francine ran a state- and tribe-certified daycare center at her home on the Rosebud Indian Reservation in South Dakota. During the relevant time period, three of Francine's own children lived with her and her husband, Ben Murphy, Sr. ("Ben Sr."), at the home: the Defendant-Appellant,[3] Christopher Two Elk (along with his wife and son), and Ben Murphy, Jr. ("Ben Jr.") (along with his girlfriend and two children).[4]

Before driving to Rapid City, South Dakota, to attend a wedding, Roach dropped the twins off at Francine's home on October 14, 2005. They remained in Francine's care until Roach picked them up on Wednesday, October 19, at 5:30 p.m. Roach took the twins to a school fund-raiser from 6:45 p.m. to 9:15 p.m. that evening after picking them up. Upon arriving home and feeding the twins, Roach realized that something was wrong with A.R. She eventually checked A.R. into the local Indian Health Services hospital at 12:40 a.m. the following morning.

_____

     [3]Two Elk lived in Francine's home until moving out on Monday, October 17, 2005.

     [4]Two Elk's biological father passed away while he was young; Francine married Ben Sr. before Two Elk's first birthday.

-3-

Shortly thereafter, Dr. Lloyd McPherson conducted an initial examination of A.R. He diagnosed A.R. with a lacerated perineum, injuries around the vaginal entrance, and a rectal tear. Dr. McPherson noted that the injuries were not "acute" – that is, they had not happened in the past few hours – but that it was difficult to tell because the wounds were contaminated. Later that morning, A.R. was flown to Sioux Valley Hospital for further care.

Dr. Ed Mailloux, a pediatrician affiliated with Sioux Valley Hospital, then examined A.R. While examining her, Dr. Mailloux videotaped the injuries. Dr. Mailloux's initial assessment regarding the time when the injuries took place departed somewhat from that of Dr. McPherson; he suggested that the fragility of the tissue in the injured area suggested that the wounds could have happened within the past 24 to 48 hours, or possibly up to 72 hours earlier. At trial, however, Dr. Mailloux revised his opinion somewhat, stating that the timing of the injuries was difficult to pinpoint but opining that the injuries occurred 3 to 5 days before he examined A.R. After Dr. Mailloux's examination, Dr. Keith Allen Hansen examined A.R.'s internal organs. He too expressed some uncertainty about when A.R.'s injuries occurred. At trial, Dr. Hansen testified that, in his opinion, A.R.'s injuries were 2 to 5 days old at the time of his exam.

The Federal Bureau of Investigation ("FBI") handled the investigation into the apparent sexual abuse of A.R. After speaking with Francine, FBI investigators concentrated on the early morning hours of Sunday, October 16, 2005. They did so because Francine told them that this time frame was the only time she had not been vigilantly watching the children. She also explained that during the late-Saturday/early-morning-Sunday time period, seven adults were hanging out at her

home, drinking and playing a board game.[5]  Francine noted that she had put the twins to bed on a comforter on the floor of a spare upstairs bedroom across from her bedroom on the night of October 15.  The FBI interviewed those in attendance, including Two Elk, as part of its investigation.

Two Elk met with FBI Special Agent David Mackey and a Sioux tribal investigator on October 21, 2005.  At that time, Two Elk denied any involvement in A.R.'s abuse.  He freely consented to the FBI's request that he provide buccal swabs for DNA-testing purposes.  He also assented to a second interview on November 3, 2005.

At the outset of the second interview, Two Elk signed a form detailing his Miranda rights and certifying that he had appeared voluntarily.  After Two Elk signed the form, Agent Mackey left the room and FBI Special Agent Kelly Kenser interviewed Two Elk alone for approximately forty-five minutes.  Agent Kenser explicitly asked Two Elk whether he had put anything in A.R.'s vagina or anus. Two Elk denied having done so.  Agent Kenser then left the room for a short time; when he returned, he asserted that Two Elk was being deceitful.  Shortly thereafter, Two Elk became emotional and eventually confessed to having vaginal and anal sex with A.R.  According to Agent Kenser, this second segment of the interview lasted approximately thirty minutes.

At that point, Agent Kenser paused the interview momentarily to bring in Agent Mackey.  Two Elk then told the Agents that on the night in question he was very inebriated, that he was under stress from college and planning to move out of Francine's home, and that he believed at the time he was having sex with an adult woman.  He did not recall entering the room where the twins were sleeping.  However,

---

[5]Of note, Two Elk, Ben Jr. and Ben. Jr.'s girlfriend stayed up until approximately 4 a.m. drinking.

he remembered lifting A.R. from the comforter on the floor and placing her on a mattress on the bed.  Two Elk stated that he then had intercourse, vaginal and anal, with A.R. for approximately 5 to 10 minutes.  When A.R. started to cry, Two Elk placed his hand over her mouth to muffle the cries.  After finishing, Two Elk used a sock to wipe blood off of himself and A.R.; he then placed the sock in a trash can which he immediately emptied.

Near the end of the interview, the agents asked Two Elk if he would be willing to restate his confession on tape.  Two Elk assented.  The taped portion of the interview lasted approximately eight minutes.  The transcript of the tape reveals a condensed version of Two Elk's prior statements to the two agents.  Two Elk's second interview lasted from 1:40 p.m. until 4:22 p.m.

## B. Procedural Background

On November 16, 2005, a grand jury indicted Two Elk on two counts of Aggravated Sexual Abuse of a Child, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(A).  The Indictment charged Two Elk with (1) contacting [A.R.'s] vulva with his penis and (2) contacting her anus with his penis.  The Indictment also alleged that Two Elk is an Indian and that the crime took place in Indian country.  Two Elk pleaded not guilty and proceeded to trial.

Before trial, Two Elk moved to suppress the statements he made to Agents Kenser and Mackey, claiming that they were involuntary.  The district court denied his motion to suppress all the statements, noting that this portion of the motion was "totally without merit and . . . probably frivolous."

Two Elk's trial took place from July 16 to July 18, 2007.  At trial, the government offered Two Elk's taped confession.  Both Agent Kenser and Agent Mackey also offered testimony about their investigation and about the substance of

their November 3 interview with Two Elk.[6]   In addition, the government introduced testimony from the three doctors who treated A.R. and from an FBI forensic DNA examiner who indicated that it was likely that A.R.'s DNA was present on the mattress cover, which would be consistent with Two Elk's confession that he lifted A.R. onto the bed and then returned her to the comforter on the floor.[7]   The government complemented Two Elk's confession with circumstantial evidence from the doctors and Carmelle Roach suggesting that A.R.'s injuries took place in the early morning hours of October 16.

Two Elk took the stand and denied any involvement in A.R.'s abuse.  He attempted to explain away the confession by claiming that Agent Kenser's interrogation tactics overwhelmed him psychologically.  He explained that he was emotionally drained and also scared during the second interview.  He also claimed that, at the time, he felt that he had the least to lose and that his sacrifice would best preserve his family.  Thus, Two Elk testified, when Agent Kenser provided prompts as to what he had done to A.R., he simply agreed with whatever Agent Kenser suggested.[8]

---

[6]Because Agent Kenser was overseas at the time of the trial, the court ordered that Kenser be deposed pursuant to Federal Rule of Criminal Procedure 15 and that the resulting tape – as edited to reflect sustained objections – be admitted "as substantive evidence."

[7]Francine testified that she never put the twins on the mattress because they might fall off the bed while sleeping.  The DNA examiner noted that the mattress cover had several blood and semen stains and stated that such stains may produce testable DNA samples for years so long as the item is not washed.  She also stated that her tests on the blood and semen stains on the mattress cover excluded Two Elk as a contributor to the particular stains.

[8]Both Agents Kenser and Mackey testified that they cautioned Two Elk not to speculate as to what he might have done.  They testified that they told Two Elk during

-7-

The defense also offered an alternate theory as to who assaulted A.R. Specifically, the defense insinuated that Ben Sr., who was in the Rosebud jail until Sunday, October 16, at about 6:00 p.m. for an alcohol-related offense, was the culprit. The defense cast Ben Sr. as a mean drunk who had been accused by an 11-year-old female of sexual molestation just before Two Elk's trial. In addition, the defense noted that the FBI had never investigated Ben Sr., failing even to take DNA swabs from him, because he was in jail at the time they believed the assault occurred.

In this vein, the defense argued that the crime did not occur in the early morning hours of October 16. Francine and others who attended the party at Francine's home Saturday night asserted that they saw or heard nothing that would indicate an assault had occurred. Francine testified that A.R. did nothing on Sunday that would indicate anything was wrong. Nor did Francine notice any blood on A.R.'s diaper or any other physical signs that A.R. was injured. Francine also acknowledged that she had slept at other times during the twins' stay with her. On this evidence, the defense contended that it was likely that the crime occurred after Ben Sr. was released from the Rosebud Jail and, more critically, after Two Elk moved out of Francine's home on Monday, October 17. The defense attempted to bolster this theory by questioning the doctors' testimony that A.R.'s injuries were not acute.

The jury convicted Two Elk of both counts on July 19, 2007. Thereafter, the U.S. Probation Office prepared a presentence report ("PSR"). Two Elk's PSR set his total offense level at 40. That offense level included a four-level increase pursuant to U.S.S.G. § 2A3.1(b)(1), which applies where the defendant used force during the instant offense. Because Two Elk had no criminal history points, his criminal history was I. These two metrics produced an advisory guideline range of 292 to 365 months

_____

the interview that they wanted the truth. And both testified that Two Elk detailed the sexual assault.

in prison.  In objections submitted prior to sentencing and reiterated at sentencing, Two Elk disputed, <u>inter alia</u>, the applicability of the § 2A3.1(b)(1) enhancement.

Despite this objection, the sentencing court opted to apply the  § 2A3.1(b)(1) enhancement.  Additionally, at the government's behest, the court found that "the defendant lied about material matters at his trial" and increased his offense level two levels pursuant to U.S.S.G. § 3C1.1.  The resulting advisory guideline range was 360 months to life.  The court sentenced Two Elk to 408 months' imprisonment on each count, to run concurrently.  Two Elk timely noticed his appeal, challenging both his convictions and his sentence.

## II.    DISCUSSION

### A. Whether the two counts charged in the Indictment are multiplicitous.

Although Two Elk did not raise this objection below, he now argues on appeal that Counts I and II of the Indictment are multiplicitous.  Punishment for both, he posits, would amount to two punishments for one act, in violation of the Fifth Amendment's Double Jeopardy Clause.

### 1.  Standard of Review

Two Elk asserts that this court reviews for plain error a double jeopardy challenge not raised in the district court.  <u>See</u> <u>United States v. Sickinger</u>, 179 F.3d 1091, 1092-93 (8th Cir. 1999) (citing <u>United States v. Uder</u>, 98 F.3d 1039, 1045 (8th Cir. 1996); <u>United States v. Merritt</u>, 982 F.2d 305, 306-07 (8th Cir. 1992)); <u>see also</u> <u>United States v. Bercier</u>, 506 F.3d 625, 633 (8th Cir. 2007).  The government, however, offers Eighth Circuit case law stating that "[i]t is well settled that '[d]ouble jeopardy claims may not be raised for the first time on appeal.'" <u>United States v. High Elk</u>, 442 F.3d 622, 624 (8th Cir. 2006) (quoting <u>United States v. Santana</u>, 150 F.3d

860, 863-64 (8th Cir. 1998)) (second alteration in original); see also United States v. Goodwin, 72 F.3d 88, 91 (8th Cir. 1995); United States v. Garrett, 961 F.2d 743, 748 & n.7 (8th Cir. 1992). We need not reconcile these two lines of cases because we conclude that, even if we review for plain error, there was no such error here.

"Under plain error review, [Two Elk] must prove that (1) there was an error, (2) the error was plain, (3) it affects substantial rights, and (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Brandon, 521 F.3d 1019, 1027 (8th Cir. 2008). In considering the facts underlying the allegedly multiplicitous convictions, this court accepts them in the light most favorable to the verdict. United States v. Chipps, 410 F.3d 438, 447 (8th Cir. 2005).

## 2. **Merits**

The Fifth Amendment's double jeopardy clause[9] proscribes the imposition of "[m]ultiple punishments for the same criminal offense." United States v. Roy, 408 F.3d 484, 491 (8th Cir. 2005). Demonstrating that an indictment violates the double jeopardy clause requires the defendant to "show that the two offenses charged are in law and fact the same offense." Id. (quotation omitted). To decide whether the defenses are the same, this court must scrutinize the statute in question to determine "whether Congress intended the facts underlying each count to make up a separate unit of prosecution." Chipps, 410 F.3d at 447. This court discerns Congressional intent from "the statutory language, legislative history, and statutory scheme." Id. at 448. If in doubt about that intent (because, for example, Congress's intended unit of prosecution is not clear and unambiguous), this court "resolve[s] doubt . . . in favor of lenity for the defendant." Id.

---

[9]"No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. v.

Count I of the Indictment charged Two Elk with knowingly engaging in a sexual act, namely "contact between his penis and [A.R.'s] vulva." Count II charged Two Elk with knowingly engaging in a sexual act, but this time by "contact between his penis and [A.R.'s] anus." Under the aggravated sexual abuse statute, "[w]hoever . . . knowingly engages <u>in a sexual act</u> with another person who has not attained the age of 12 years, . . . or attempts to do so, shall be fined under this title and imprisoned for not less than 30 years or for life." 18 U.S.C. § 2241(c) (emphasis added). "[T]he term 'sexual act' means -- (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, [sic] slight." <u>Id.</u> § 2246(2)(A).[10]

Against this statutory backdrop, we must decide "how many sex crimes . . . a defendant commit[s] when he inflicts a series of distinct sexual offenses on the victim during a single incident[.]" <u>Bercier</u>, 506 F.3d at 634. To answer this question, we must first decide whether aggravated sexual abuse under § 2241(c) is a "course-of-conduct offense or a separate-act offense." <u>Chipps</u>, 410 F.3d at 449. <u>Chipps</u> involved a separate statute prohibiting "simple assault" and in that context stated,

---

[10]The definition of "sexual act" also includes:

(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

18 U.S.C. § 2246(2).

To determine whether this indictment is multiplicitous, [this court] must decide whether Congress intended to punish assault as a course of conduct, such that the first bit of assaultive conduct . . . is of a piece with the second bit . . . , or whether Congress sought to punish separately individual acts within an assaultive episode.

Id. at 448. If the offense is a "course-of-conduct offense," this court then applies "the impulse test," treating "as one offense all violations that arise from that singleness of thought, purpose or action, which may be deemed a single 'impulse.'" Id. at 449 (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 224 (1952)). If the offense is a "separate-act offense," however, our inquiry is at an end because there is no double jeopardy problem.

We conclude that § 2241(c)'s language confirms that aggravated sexual abuse is a separate-act offense. The plain language of § 2241(c) states that a person commits aggravated sexual abuse by "engag[ing] in a sexual act with another person." (Emphasis added). The statute does not say "sexual act or acts," or "sexual course of conduct." Each of the permutations enumerated in § 2246(2) constitutes a sexual act and they are linked in the disjunctive. It follows, then, that engaging in multiple sexual acts (as listed in § 2246(2)) would amount to multiple violations of § 2241(c) and would leave the perpetrator susceptible to multiple punishments thereunder. Unlike Chipps, this reading does not break an assaultive episode down into absurd quanta, (e.g., kicking and punching during a single incident). Thus, the "simple assault" charged in Chipps, see 18 U.S.C. § 113(a)(5), can be distinguished from the sexual acts charged here under §§ 2241(c) and 2246(2).[11]

_____

[11]The statutory language at issue in Chipps addressed "simple assault" without breaking that conduct into separate, disjunctive acts while § 2246(2) details the various types of "sexual act" addressed by § 2241(c).

-12-

In addition, the <u>Bercier</u> court noted that "[a] number of cases have held that state court convictions for multiple sex offenses did not violate the Double Jeopardy Clause if, under state law, 'a defendant may receive multiple punishments for numerous sex offenses rapidly committed with the sole aim of sexual gratification.'" <u>Bercier</u>, 506 F.3d at 634 (quoting <u>Rhoden v. Rowland</u>, 10 F.3d 1457, 1462 (9th Cir. 1992)). The <u>Bercier</u> court could not find "a case thoroughly addressing this question in the context of the federal sexual assault" statutes, <u>id.</u>, and <u>Bercier</u> itself did not resolve the issue. Nonetheless, in light of <u>Bercier</u>'s tone and its reference to the state decisions holding various sex acts within a single course of conduct to be separate offenses, the case provides some support for our interpretation of § 2241. The statute's language and <u>Bercier</u> confirm that the district court did not err and certainly did not commit plain error. As such, we do not reach Two Elk's argument that the multiplicitous count tainted the other verdict.

**B. Whether the district court committed reversible error in admitting certain hearsay statements.**

Two Elk next asserts that the district court deprived him of a fair trial by admitting four hearsay statements. Specifically, he objects to Agent Mackey's testimony alluding to a statement Francine made regarding the time period when the twins went unattended, FBI Special Agent Oscar Ramirez's reiteration at trial of a statement made by Ben Sr., and statements made by Agent Kenser and Agent Mackey regarding Two Elk's confession. The government retorts that each is not hearsay at all, citing Eighth Circuit cases holding that statements offered to elucidate the reasons for a police investigation are not hearsay. Alternatively, the government asserts that the substance of each of the purported hearsay statements was cumulative and, thus, any error was harmless. We discern no reversible error in this regard.

## 1. **Standard of Review**

"Evidentiary rulings are reviewed for abuse of discretion," giving due "deference to the district judge who saw and heard the evidence." United States v. Davidson, 449 F.3d 849, 853 (8th Cir. 2006) (quotation omitted); see also United States v. Love, 521 F.3d 1007, 1009 (8th Cir. 2008) (reviewing district court's decision on hearsay matter for abuse of discretion). "A district court by definition abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100 (1996). This court reviews for plain error an admission of evidence to which the defendant did not object below. United States v. Sharpfish, 408 F.3d 507, 511 (8th Cir. 2005).

This court is not "bound by the grounds on which the district court admitted the evidence" because it "may affirm a district court's judgment on any basis supported by the record." Bercier, 506 F.3d at 629-30 (quotation omitted). In addition, "[a] non-constitutional error admitting hearsay testimony 'that does not affect substantial rights must be disregarded.'" Id. at 632 (quoting Fed. R. Crim. P. 52(a)). Under Rule 52's harmless-error standard, the reviewing court must consider the entire record to ensure that "the error did not influence or had only a very slight influence on the verdict." Id. (quoting United States v. Cortez, 935 F.2d 135, 140 (8th Cir. 1991)). If the trial court properly admitted other evidence covering the same ground as the erroneously admitted evidence, this court has often held the error harmless because the evidence is cumulative. See id.

## 2. **Merits**

Rule 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is inadmissible absent a Federal Rule

of Evidence exception or other exception established by the Supreme Court.  Fed. R. Evid. 802.

a. Agent Mackey's Statement Referring to Francine's Testimony

First, Two Elk objects to the court's ruling during the following colloquy:

Q [Prosecutor]: Well, did Francine Murphy advise you as to – in the interview when the children were not with her?

MS. MINER [Defense Counsel]: Objection.  Hearsay.

THE COURT: Overruled.  Calls for a "yes" or "no" answer.

A [Agent Mackey]: Yes.

Q [Prosecutor]: And she testified to that earlier today in this courtroom?

A [Agent Mackey]: Yes.

In his briefs, Two Elk never specifies which of the answers listed above he regards as hearsay.  Instead, he complains that "FBI Agent Mackey repeated a statement by [A.R.'s] caretaker, Francine, that between Saturday, October 15, 2005, and Wednesday, October 19, 2005, [A.R.] was out of Francine's sight only once early on Sunday morning, October 16."

Had Agent Mackey actually repeated such a statement, there would be a potential hearsay problem.  But, the court did not admit any hearsay in the colloquy quoted above.  Neither of the prosecutor's questions called for a response that would include hearsay.  The first simply elicited Agent Mackey's recollection of whether Francine had told him something (without straying onto hearsay grounds by asking what exactly she told him).  The second elicited Agent Mackey's direct recollection of what Francine had said in her testimony that very day.  Neither included a statement by an out-of-court declarant and neither offered such a statement for its truth.  The district court did not err in admitting this testimony.

-15-

b. Agent Ramirez's Reiteration of Ben Murphy Sr.'s Statement

Second, Two Elk argues that the court improperly admitted Agent Ramirez's reiteration of Ben Sr.'s assertion that he had not assaulted A.R. More particularly, the prosecutor asked Agent Ramirez, "And what was [Ben Sr.'s] response when you asked him about his involvement with the A.R. matter?" After the defense counsel objected and the judge overruled the objection, Agent Ramirez answered, "He denied doing it and mentioned that he was in jail during the time that it could have happened."

The government argues (1) that the statement is not hearsay under United States v. Malik, 345 F.3d 999, 1001 (8th Cir. 2003), and (2) that, regardless, any error was harmless because the testimony was cumulative. The Malik court held that a statement is not offered to prove the truth of the matter asserted if it elucidates the "reasons for or propriety of a police investigation." 345 F.3d at 1001; see also Suggs v. Stanley, 324 F.3d 672, 681-82 (8th Cir. 2003) (upholding admission of officer's statement about what dispatcher told him because it was offered to show why officer went to a specific house); United States v. King, 36 F.3d 728, 732 (8th Cir. 1994). In this regard, the government ventures that the FBI investigators decided not to investigate Ben Sr. thoroughly because he denied assaulting A.R. Thus, the government claims it offered the statement to explain why the government turned its investigatory eye elsewhere, not for the truth of the matter asserted.

The government's argument stretches Malik too far. First, Agent Ramirez was not involved in the A.R. assault investigation. Rather, he was tasked with investigating the alleged inappropriate touching of an 11-year-old female at the school at which Ben Sr. worked. Second, it seems implausible that the FBI investigators would simply accept a suspect's denial of liability and turn their attention elsewhere. In this regard, the statement is a fairly flimsy rationale for the

FBI's investigative steps and it is exceedingly unlikely that it was offered for this purpose.

Moreover, in <u>Malik</u>, the court noted that the trial court had instructed the jury to consider the evidence only as an elucidation of the officers' reasons for stopping the defendant, after the defendant introduced evidence suggesting that the officers planted a gun on the defendant. <u>See</u> <u>Malik</u>, 345 F.3d at 1002. Here, there was no such limiting instruction, nor was any defense tendered in this case dependent upon the motives of the officers in investigating Two Elk. <u>Cf.</u> <u>King</u>, 36 F.3d at 732 (noting court's "concern[] that the jury's use of [the non-hearsay testimony] was not appropriately limited by an instruction from the court . . . "). With no other plausible justification for admitting the statement, the court erred as a matter of law and thereby abused its discretion. Thus, we must address the prejudicial effect of the hearsay.

Two Elk's theory at trial was that A.R.'s injuries occurred after he moved out and that Ben Sr. was a prime potential suspect whom the FBI all but ignored. As such, Ben Sr.'s denial of culpability arguably could have had an effect on the jury, especially when repeated by an FBI Agent. Yet Ben Sr.'s denial was intertwined with his statement that he was in jail at the time the assault occurred. And the jury heard that Ben Sr. was incarcerated until Sunday at 6 p.m. or so on multiple occasions prior to Agent Ramirez's testimony. Indeed, Two Elk's defense clamored throughout the trial that A.R.'s injuries might well have occurred after Ben Sr. returned home. No juror would have been surprised to learn that a potential suspect denied the conduct in question, no juror would have been likely to accept such a denial without skepticism, and no juror would have been shocked to learn that Ben Sr. was in jail until Sunday evening. Additionally, as detailed above, the prosecution's strong case against Two Elk, stood on the shoulders of Two Elk's own recorded confession. Thus, we do not believe the court's erroneous evidentiary ruling influenced the verdict.

Two Elk next argues that the court erred in admitting two final hearsay statements. First, Agent Kenser repeated to the jury statements he made to Agent Mackey in the hallway just after Two Elk implicated himself during the November 3 interview. Second, Agent Mackey told the jury what Kenser told him that day (namely, that Two Elk admitted to sexually assaulting A.R.).[12] The government again relies on Malik, claiming that the two statements were not hearsay, and argues, alternatively, that the statements had no prejudicial effect on Two Elk. Two Elk concedes that he did not object to these statements at trial and that this court thus reviews for plain error. See United States v. Hyles, 521 F.3d 946, 959 (8th Cir. 2008).

Again, Malik is not applicable. Under Malik, "evidence may not be admitted for the non-hearsay purpose of explaining an investigation where the propriety of the investigation is not a relevant issue at trial." 345 F.3d at 1001. While Two Elk questioned the FBI's decision to focus on the early Sunday morning time frame (which abbreviated the FBI's investigation of Ben Sr.), Two Elk did not dispute the propriety of the FBI's focus on him after the November 3 interview. Nor could he have: he had just confessed to the crime. Accordingly, the propriety of the FBI's investigation of Two Elk after his confession was not at issue.

Moreover, the statements were offered for the truth of the matter asserted therein, namely that Two Elk had confessed, in Agent Kenser's presence, to

---

[12]Both statements appear to be "[h]earsay included within hearsay" which is admissible only "if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Fed. R. Evid. 805. As a matter of law, however, Two Elk's statement – embedded in both Agent Mackey's and Agent Kenser's statements – is not hearsay because it is "offered against [Two Elk] and is [Two Elk's] own statement." Fed. R. Evid. 801(d)(2)(A).

committing the crime. "Where the only possible relevance of the out-of-court statement is to show the defendant committed the act he has been charged with, the statement is not properly admissible for a non-hearsay purpose." United States v. Blake, 107 F.3d 651, 653 (8th Cir. 1997). Similarly, if the only possible relevance of the out-of-court statements is to show that the defendant said that he committed the act, the statement is not admissible for a non-hearsay purpose. Thus, these statements were hearsay and the court erred in admitting the testimony.

We need not decide whether such error was plain, however, because Two Elk cannot bear his burden with respect to the third prong of the plain-error inquiry: neither hearsay statement prejudiced Two Elk. The hearsay statements admitted here did not add anything to the unimpeached testimony that Two Elk had confessed and thus they were cumulative. See United States v. Azure, 845 F.2d 1503, 1507 (8th Cir. 1988) (noting that hearsay statement "was corroborated by [the out-of-court declarant's] own unimpeached testimony, by the testimony of two [other witness], and by" other documentary evidence); see also Bercier, 506 F.3d at 632 (noting that erroneous admission of redundant evidence is typically harmless). The court admitted Two Elk's taped confession and heard both Agents detail the substance of their November 3 interview with Two Elk. Thus, although it may have been error to admit these two out-of-court statements, these errors were not prejudicial.

**C. Whether the district court committed reversible error in admitting certain expert testimony.**

Two Elk challenges certain aspects of the expert testimony introduced against him. He contends that the district court neglected to require the government to develop an adequate foundation for Dr. McPherson's testimony, and similarly erred with respect to the testimony and demonstrative exhibits presented by Dr. Mailloux and Dr. Hansen. Two Elk insists this was a critical mistake because he sought to sow doubt regarding when the injuries to A.R. happened and the doctors' testimony

contravened Two Elk's theory. We conclude that the court committed no reversible error.

### 1. **Standard of Review**

"We review a district court's ruling admitting expert testimony under Federal Rule of Evidence 702 for an abuse of discretion." United States v. Eagle, 515 F.3d 794, 800 (8th Cir. 2008). Similarly, the abuse of discretion standard applies when we review a district court's rulings admitting exhibits. See C.L. Maddox, Inc. v. Benham Group, Inc., 88 F.3d 592, 600 n.8 (8th Cir. 1996). This court reviews for plain error the admission of any unobjected-to testimony. United States v. Collins, 340 F.3d 672, 682 (8th Cir. 2003).

### 2. **Merits**

The district court may admit the testimony of a witness whose knowledge, skill, experience, training, or education merits expert status if (1) the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, and (2) the evidence is relevant and reliable. Eagle, 515 F.3d at 800; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-91 (1993). "A district court . . . enjoys broad latitude when it decides how to determine reliability, and [t]here is no requirement that the [d]istrict [c]ourt always hold a Daubert hearing prior to qualifying an expert witness." United States v. Kenyon, 481 F.3d 1054, 1061 (8th Cir. 2007) (internal citations, quotations omitted). Accordingly, so long as the court is satisfied with the expert's knowledge, skill, experience, training, or education, "and the expert's testimony is reasonably based" on that expertise, "the court does not abuse its discretion by admitting the testimony without a preliminary hearing." Id. Nevertheless, "[t]he district court must exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to the jury, otherwise, the

factual basis of the testimony goes to the weight of the evidence." Larson v. Kempker, 414 F.3d 936, 940-41 (8th Cir. 2005) (quotation omitted) (emphasis added).

"In child sexual abuse cases, 'a qualified expert can inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits.'" Eagle, 515 F.3d at 800 (quoting United States v. Kirkie, 261 F.3d 761, 765-66 (8th Cir. 2001)). Such an expert may also offer a synopsis of the medical evidence. Id.

### a. Dr. McPherson's Testimony Regarding A.R.'s Injuries

Over the defense's objection, Dr. McPherson testified regarding the definition of an "acute" injury and the characteristics of A.R.'s injuries that led him to believe that her injuries were not acute. Two Elk argues that there was "no indication or testimony that [Dr. McPherson's] opinion was based upon a reasonable medical certainty."[13]

As in Kenyon, however, Two Elk does not appear to have challenged Dr. McPherson's expertise. See Kenyon, 481 F.3d at 1061. Rather, Two Elk suggests that the district court must ensure that everything a medical expert says on the stand is individually supported by reasonable medical certainty. In support, Two Elk cites Graham v. Ozark Mountain Sightseeing, Inc., 181 F.3d 924, 926 (8th Cir. 1999), for the propositions that "medical experts . . . must testify to a reasonable medical

---

[13]The government argues that Two Elk's defense counsel failed to object contemporaneously, because she interposed her objection between a prior question and answer but remained mum after the specific question that elicited the testimony at issue. As such, the government contends that plain-error review is appropriate. Two Elk disagrees and suggests that the abuse of discretion standard applies. We need not decide this issue because we conclude that under either standard the court committed no reversible error.

certainty" and that "[e]xpert testimony that defendants 'probably' or 'likely' caused the harm is insufficient . . . ."

Two Elk's reliance on <u>Graham</u> is misplaced. In <u>Graham</u>, the court addressed expert testimony offered to prove an element of a state tort cause of action. <u>Id.</u> In that particular situation, <u>Erie</u> compelled that Rule 702 – which generally is a procedural rule – yield to a state <u>substantive</u> rule requiring medical experts to testify to a "reasonable medical certainty" regarding causation. <u>Cf. id.</u> (citing Missouri case-law).

In the federal criminal context we confront here, however, the <u>Larson</u> rule (which is derived from Rule 702 and <u>Daubert</u>) applies. And there is little doubt that Dr. McPherson's testimony was reliable under <u>Larson</u>. Dr. McPherson explored the difficulties inherent in assessing how acute A.R.'s injuries were, but concluded that they were not acute.[14] As the district court determined, this testimony was likely to assist the trier of fact. At that point, it was "up to the opposing party to examine the factual basis for the opinion in cross-examination." <u>Olson v. Ford Motor Co.</u>, 481 F.3d 619, 627 (8th Cir. 2007) (quotation omitted); <u>cf.</u> <u>Kudabeck v. Kroger Co.</u>, 338 F.3d 856, 861 (8th Cir. 2003) ("[N]othing in Rule 702, <u>Daubert</u>, or its progeny requires that an expert resolve an ultimate issue of fact to a scientific absolute in order to be admissible." (quotation omitted)). Thus, the court did not abuse its discretion in admitting the testimony; it follows that the court did not plainly err in doing so either.

### b. Dr. Mailloux's Testimony Regarding A.R.'s Injuries

---

[14]Dr. McPherson offered his opinion – "based upon [his] experience and education and training," – alongside a caveat: "[I]t's hard to determine actually what period of time it could have taken place; but [A.R.'s injuries were] not acute in the sense that [they] happened say within a few hours of the time that she arrived." The foundation for this opinion was Dr. McPherson's twenty-plus years of work in emergency rooms.

Two Elk next objects to Dr. Mailloux's testimony comparing A.R.'s injuries to those he has witnessed in other pediatric examinations he has performed. Two Elk argues that the trial judge erred in admitting this testimony because there was nothing on the record to show that "the comparison group was of a similar age or size to [A.R.]." Again, Kenyon teaches that the admission of Dr. Mailloux's testimony was not an abuse of discretion. 481 F.3d at 1061. In fact, by basing his testimony on the myriad other pediatric examinations he has performed, Dr. Mailloux did exactly what an expert witness should do: answer questions about A.R.'s injuries in light of his specialized medical expertise and his experience.

c. The Admission of Demonstrative Exhibits Depicting the Genitalia of Female Children and the Testimony Accompanying Those Exhibits

Lastly, Two Elk argues that the trial court erred in admitting three photographs of the "normal structures . . . in the genitalia of a small female child," and in allowing Dr. Mailloux and Dr. Hansen to reference the photographs as they explained A.R.'s injuries. Two Elk asserts that these demonstrative exhibits were neither reliable nor relevant.

Demonstrative exhibits may be admitted, at the trial court's discretion, as "educational tool[s] for the jury." Wipf v. Kowalski, 519 F.3d 380, 387 (7th Cir. 2008). Rule 901 mandates only that the authentication requirement "as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The Rule then notes that the "[t]estimony of [a] witness with knowledge" suffices. Fed. R. Evid. 901(b)(1).

Both Dr. Mailloux and Dr. Hansen authenticated the photographs as accurate depictions of the normal genitalia of young females. But Two Elk suggests that the photographic evidence and the accompanying testimony were unreliable because there

was no showing that the photographed children were of the same age or shared the same physical characteristics as A.R. The issue then is whether the doctors' testimony, during which they referenced the photographs, was reliable and whether it was helpful to the trier of fact.

At that point in the trial, the court had already qualified both Dr. Mailloux and Dr. Hansen as experts. Their testimony was reasonably related to their respective expertise. Moreover, Two Elk's argument that their testimony would not be of pedagogic or illustrative value to the laypersons on the jury is unavailing. Both Dr. Mailloux and Dr. Hansen confirmed on the stand that the photographs would assist them in explaining to the jury the results of their respective examinations of A.R. And the trial testimony regarding A.R.'s injuries included a number of anatomical terms that, we assume, would be unfamiliar to most. The district court did not err in concluding that the photographs and accompanying testimony were reliable.

Relatedly, Two Elk argues that the photographs were irrelevant because "there was no issue before the jury about the nature or extent of A.R.'s injuries."[15] As the government points out, however, this argument is inaccurate. The photographs were relevant for two main reasons. First, Two Elk postulated that A.R.'s injuries occurred after he had moved out of Francine's house. Thus, the doctors' testimony regarding the nature and extent of A.R.'s injuries was relevant to the issue of when A.R. was assaulted. Second, Count I of the Indictment charged Two Elk with penile-vaginal contact, while Count II charged penile-anal contact. The doctors' testimony bolstered

---

[15]Two Elk weaves Federal Rule of Evidence 403 thread into this argument, suggesting that "such evidence could only upset the jury and create an aura where sympathy and passion encouraged the jury to ignore the lack of actual proof." Because Two Elk did not specifically advance a Rule 403 unfair prejudice argument in his brief, we will not resolve that issue (although it is not apparent to us that Rule 403 would have been violated).

-24-

the government's argument that Two Elk had committed both crimes. The trial judge did not abuse his discretion in this regard either.

### D. Whether prosecutorial misconduct deprived Two Elk of a fair trial.

### 1. Standard of Review

Trial judges have "broad discretion in controlling closing arguments." Hyles, 521 F.3d at 958. They have similarly broad discretion in controlling the course of cross-examination. See Love, 521 F.3d at 1009 ("We review a district court's evidentiary ruling for abuse of discretion, including those regarding the scope of cross-examination." (quotation omitted)). Where Two Elk failed to object to an instance of alleged prosecutorial misconduct, this court reviews for plain error. Hyles, 521 F.3d at 958.

### 2. Merits

"To obtain a reversal for prosecutorial misconduct, [Two Elk] must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the defendant's rights in obtaining a fair trial." Id. Three factors inform this court's analysis of the prejudice prong: "(1) the cumulative effect of the misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions, if any, taken by the district court." Eagle, 515 F.3d at 804-05. The first factor confirms that this court must consider each instance of alleged misconduct both by itself and in combination with the other alleged prosecutorial oversteps. Cf. United States v. Eizember, 485 F.3d 400, 405 (8th Cir. 2007). Below, we review each of the allegedly improper prosecutorial acts individually and then turn to their cumulative effect.

<u>a. The Prosecutor's Allusion to Humpty-Dumpty</u>

Two Elk first contends that the prosecutor inappropriately appealed to the jurors' passion and sympathy with an allusion to a nursery rhyme:

> [Prosecutor]: . . . All of the king's horses and all of the king's men, ladies and gentlemen, can't put A.R. back together again.
> MS. MINER [Defense Counsel]: Your Honor, I would object.
> THE COURT: Overruled.
> MS. MINER: Sympathy is not to play a part in this.
> THE COURT: Overruled.
> [Prosecutor]: You can't put A.R. back together again, but your verdict can hold the person responsible. . . .

It is well-settled that prosecutorial "appeals to the passion, prejudice, or sympathy of jurors during closing argument are improper." <u>Eagle</u>, 515 F.3d at 805 (citing <u>Viereck v. United States</u>, 318 U.S. 236, 247 (1943)); <u>see also</u> <u>United States v. Mullins</u>, 446 F.3d 750, 759 (8th Cir. 2006).

In <u>Eagle</u>, the prosecution made similarly strong statements regarding the impact of a crime on an eight-year-old victim of sexual assault. <u>See</u> <u>Eagle</u>, 515 F.3d at 805. The <u>Eagle</u> court noted that the prosecutor's arguments were reasonable inferences from the evidence and did not find reversible error. <u>Id.</u> And we have held that prosecutors may use "colorful and forceful language in their arguments to the jury." <u>Mullins</u>, 446 F.3d at 759 (quotation omitted).

Here, the prosecutor did not "stray from the evidence and the reasonable inferences that may be drawn from it." <u>Id.</u> (quotation omitted). Moreover, the allusion to Humpty-Dumpty was no more egregious than the <u>Eagle</u> prosecutor's remarks. The statement, therefore, was not improper.

Even if were to conclude otherwise, the statement did not deprive Two Elk of a fair trial. The jury had already listened to three doctors describe the awful details of A.R.'s injuries. Furthermore, as to the second factor, the admitted evidence of Two Elk's guilt was quite strong. The third factor also militates against reversal. The jury was instructed that they were "to perform [their] duty without bias or prejudice, because the law does not permit jurors to be governed by sympathy," and that "[s]tatements, arguments, questions and comments by lawyers . . . are not evidence." In sum, the statement did not deprive Two Elk of a fair trial.

b. The Prosecutor's Statement Regarding the Reasonable Doubt Standard Favored by Defense Attorneys

Two Elk posits that a second statement by the prosecutor also amounted to misconduct. The prosecutor remarked, "[t]here's an old saying in the law, that if the standard of proof had to be met as articulated by defense attorneys, every crime would have to be witnessed by a bus load of nuns with video cameras." Two Elk's counsel objected and the judge overruled her. On appeal, Two Elk suggests that the prosecutor thereby directed a "personal, unsubstantiated attack[] on the character and ethics of" his defense counsel which may have "induce[d] the jury to trust the Government rather than its own view of the evidence."

We think this statement was arguably improper. It had the potential both to obfuscate the reasonable doubt standard and to impugn the defense counsel. See, e.g., United States v. Holmes, 413 F.3d 770, 775 (8th Cir. 2005) (reversing, on ground of prosecutorial misconduct, where prosecutor told jury that defense attorney was using "smoke and mirrors" to divert their attention and implied that the attorney had conspired with client to fabricate testimony).

Again, even assuming it was improper, we do not believe that it deprived Two Elk of a fair trial. First, the statement's cumulative effect was likely negligible. Far

-27-

from an <u>ad hominem</u> attack on the defense counsel, the statement seems more like an inopportune attempt at levity. <u>Cf.</u> <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning . . . ."). More importantly, the statement was unlikely to alter the jury's understanding of the reasonable doubt standard. <u>See</u> <u>United States v. Foley</u>, 508 F.3d 627, 637-38 (11th Cir. 2007). The judge instructed the jury on the proper standard and both the prosecution and defense discussed the standard during their closing arguments.

As to the second factor, the statement pales in comparison to the government's evidence of Two Elk's guilt. And the final factor reinforces our belief that the statement had little cumulative effect: the jury instructions clarified the reasonable doubt standard, and the court labeled the statement as "just argument" on the record immediately after it was made. <u>See</u> <u>Eagle</u>, 515 F.3d at 806 (asserting "district court's instruction that closing arguments are not evidence is a curative action that serves to alleviate any risk of prejudicial impact"). The trial judge thereby dismissed the import of the statement – and for good reason, it was too insubstantial to skew the trial's fundamental fairness.

### 3. The Prosecutor's Cross-Examination of Agent Ramirez

Lastly, Two Elk sees reversible error in the prosecutor's questioning of Agent Ramirez, a defense witness. Specifically, the prosecutor asked, and Agent Ramirez answered, two questions that Two Elk regards as impermissible vouching:

Q [Prosecutor]: Have any charges been brought against [Ben Murphy, Sr.] with respect to this matter that you are aware of?
A [Agent Ramirez]: No, sir.
Q [Prosecutor]: Is that a decision made by the U.S. Attorney's office?
A [Agent Ramirez]: Yes, it is.

Two Elk concedes that he failed to object to this line of questioning during the trial. Thus, we review for plain error. Hyles, 521 F.3d at 958.

Two Elk asserts that this line of questioning amounted to misconduct because the prosecutor thereby (1) "induce[d] the jury to trust the Government's judgment rather than its own view of the evidence," and (2) implied that the prosecutor knew something that the jury did not about whether Ben Sr. was a possible perpetrator.

"Improper vouching may occur when the government . . . refers to facts outside the record or implies that the veracity of a witness is supported by outside facts that are unavailable to the jury . . . ." United States v. Santana, 150 F.3d 860, 863 (8th Cir. 1998).

Had this testimony been properly challenged, it may very well have been excluded. The prosecutor's questioning tacitly informed the jury that the U.S. Attorney's Office had opted not to charge Ben Sr., focusing instead on the defendant. Of course, the details of the government's investigation of Ben Sr. were not in evidence. The prosecutor thereby intimated that the government had access to knowledge about the case to which the jury was not privy.

Nonetheless, Two Elk must still "show[] prejudice – that is, . . . a reasonable probability that the outcome would have been different absent the alleged error." United States v. Abdullahi, 520 F.3d 890, 896 (8th Cir. 2008) (quotation omitted). At the outset, we note that Two Elk's counsel actually asked Agent Mackey similar questions on cross-examination well before Agent Ramirez testified. Specifically, she queried whether "anyone else [was] ever arrested for this crime?" and whether "anyone else [was] ever charged in any way for this crime?" Agent Mackey responded, "no." The defense thereby broached the topic and lessened the impact of Agent Ramirez's testimony.

As we have explained above, the government had a strong case against Two Elk. The government adduced Two Elk's taped confession and other evidence that dovetailed with the details of Two Elk's confession. While Two Elk makes much of Ben Sr.'s "checkered past," the prosecution's evidence against Two Elk was far more substantial than Two Elk's insinuations about Ben Sr. And Two Elk was able to introduce ample – albeit entirely speculative – evidence pinning Ben Sr. as a potential suspect.[16] Indeed, Two Elk had already confessed to the crime once and offered details about his conduct. Two Elk has not borne his burden of showing a reasonable probability that the court's error in allowing this line of questioning was prejudicial.

d. The Cumulative Effect of the Alleged Prosecutorial Misconduct

"Prejudice sufficient to warrant reversal may result from the cumulative effect of repeated improper comments by the prosecutor." United States v. Johnson, 968 F.2d 768, 771 (8th Cir. 1992). Taken together, however, the instances of alleged misconduct here did not prejudice Two Elk.

**E. Whether the district court erred by enhancing Two Elk's base offense level four levels pursuant to U.S.S.G. § 2A3.1(b)(1).**

Finally, Two Elk argues that his sentence should be reversed because the district court erroneously enhanced his base offense level pursuant to U.S.S.G. § 2A3.1(b)(1), an enhancement for using force during the offense. He contends that the

---

[16]As a secondary matter, the jury may well have believed that the facts which led to the decision not to prosecute Ben Sr. were in fact before them. That is, the jury had already heard that Ben Sr. was in the Rosebud jail at the time when the FBI believed the probable time the assault took place. Cf. United States v. Rivas, 493 F.3d 131, 137 (3d Cir. 2007) ("[A] prosecutor may urge that a witness is trustworthy by arguing from record evidence; vouching occurs only where the prosecutor implicitly refers to information outside the record.").

-30-

court made clearly erroneous factual findings in support of its decision to apply § 2A3.1(b)(1) and also erred as a matter of law. We disagree.

### 1. Standard of Review

This court reviews "for clear error the district court's factual findings underlying the imposition of a sentencing enhancement based on the defendant's role in the offense," United States v. McDonald, 521 F.3d 975, 978 (8th Cir. 2008) (quotation omitted), "and examine[s] de novo the application of the Guidelines," United States v. Yah, 500 F.3d 698, 702 (8th Cir. 2007). "[O]nly if [this court has] a definite and firm conviction that a mistake has been made," will it reverse the sentencing court's factual findings. United States v. Garcia, 512 F.3d 1004, 1005 (8th Cir. 2008). "[S]entencing judges are only required to find sentence-enhancing facts by a preponderance of the evidence." United States v. Farrington, 499 F.3d 854, 859 (8th Cir. 2007).

### 2. Merits

The Guideline at issue provides that "[i]f the offense involved conduct described in 18 U.S.C. § 2241(a) or (b), increase by **4** levels." U.S.S.G. § 2A3.1(b)(1). By cross-referencing 18 U.S.C. 2241(a), § 2A3.1(b)(1) sweeps in defendants who have "knowingly cause[d] another person to engage in a sexual act . . . by using force against that other person." 18 U.S.C. § 2241(a)(1).

a. Two Elk's Objection to the District Court's Factual Findings

During the sentencing hearing, the trial judge stated:
The defendant told the two FBI agents that he did commit this offense and that he put his hand over the victim's mouth to keep her from awakening somebody. He denied this at trial, but I find that he did use

-31-

force to sustain – to hold the victim down, if you will, and to prevent the victim from screaming. And that's in addition to the great discrepancy here in the size and weight of the defendant compared to the victim.

The court thus felt the enhancement was justified. Two Elk disputes three aspects of the court's factual findings: (1) that he put his hand over the victim's mouth to keep her from awakening anyone; (2) that he held the victim down; and (3) that he used force to prevent the victim from screaming.

As Two Elk concedes, the transcript of his recorded confession reveals that he lifted A.R. from a mattress on the floor and placed her on a bed and that he covered her mouth with his hand to muffle her cries. However, because the transcript offers no clue as to whether A.R. was screaming or whether Two Elk held A.R. down, Two Elk contends that the judge clearly erred in drawing inferences from the record.

There was more than enough evidence in the record to support the sentencing court's findings of fact. Two Elk's argument parses the court's language in excruciating detail. Yet the court need not repeat the record verbatim to enter a valid factual finding. And nothing the court found misstated the evidence in the record. Rather, the court's findings fairly accurately reflect Two Elk's admissions and hence they were not clearly erroneous. See Farrington, 499 F.3d at 859 ("[A]s long as the determination is plausible in light of the record as a whole, clear error does not exist." (quotation omitted)).

b. Two Elk's Objection to the District Court's Legal Conclusion

Although § 2241 does not define the term "force," this court has held, [t]he requirement of force may be satisfied by a showing of the use, or threatened use, of a weapon; the use of such physical force as is

sufficient to overcome, restrain, or injure a person; or the use of a threat of harm sufficient to coerce or compel submission by the victim.

United States v. Allery, 139 F.3d 609, 611 (8th Cir. 1998) (quoting United States v. Fire Thunder, 908 F.2d 272, 274 (8th Cir. 1990)).  In addition, "force sufficient to prevent the victim from escaping the sexual contact satisfies the force element." Id. On the other hand, a discrepancy in the size of the victims is, by itself, insufficient to conclude that the defendant used force.  See United States v. Blue, 255 F.3d 609, 613 (8th Cir. 2001) ("[S]ize difference alone cannot establish use of force under section 2A3.1(b)(1).").

The district court did not err as a matter of law in applying the enhancement based on the record before it.  While a size discrepancy alone is insufficient to merit the four-level increase, id., it is a factor that bears on the applicability of § 2A3.1(b)(1), see, e.g., United States v. Crow, 148 F.3d 1048, 1050 (8th Cir. 1998) (noting, in reversing district court's application of enhancement, that "the record is devoid of any evidence regarding Crow's size in relation to the victim's . . ."). Here, of course, there was a substantial discrepancy between the body mass of Two Elk, a twenty-five year old male, and that of A.R., a two-and-a-half-year-old female.  In addition, Two Elk lifted A.R. off the floor and placed her on the bed.  And, as a final factor, Two Elk muffled A.R.'s cries with his hand.  The net result of these actions certainly supports the district court's conclusion that Two Elk used force to accomplish these sexual assaults.

## III.   CONCLUSION

For the reasons detailed above, we AFFIRM Two Elk's convictions and sentence.

_____