# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 16, 2013 Session

## STATE OF TENNESSEE v. MORRIS WAYNE ADCOCK

**Appeal from the Criminal Court for Davidson County**
**No. 2009D3291     Monte D. Watkins, Judge**

---

**No. M2012-01631-CCA-R3-CD - November 25, 2013**

---

Defendant-Appellant, Morris Wayne Adcock, was indicted by a Davidson County Grand Jury for aggravated assault and domestic assault. A jury convicted him of the lesser included offense of simple assault and the charged offense of domestic assault, Class A misdemeanors. The trial court merged the simple assault conviction with the domestic assault conviction and sentenced Adcock to eleven months and twenty-nine days in the county jail. On appeal, Adcock argues: (1) the trial court erred in failing to rule on the defense's objection to one of the prosecutor's questions to Joshua Jernigan; (2) the State committed prosecutorial misconduct; (3) the cumulative effect of the errors entitles him to relief; and (4) his sentence is excessive. Upon review, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

G. Frank Lannom and Melanie R. Bean, for the Defendant-Appellant.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Hugh T. Ammerman, III, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** Robin G. Adcock, the victim, testified that she and her husband Morris Wayne Adcock, the Defendant-Appellant, attended a biker event called "Harley Drag" at the Union Hill drag strip in rural Davidson County on May 17, 2008. The victim said that she and

Adcock attended the event together even though they were separated. At approximately 9:30 p.m., Adcock's good friend, Joshua Jernigan, arrived at the event. The victim stated that Jernigan's mother and Adcock had gone to school together, and Adcock and Jernigan were almost like family. At Adcock's request, Jernigan had brought moonshine with him to the event. Although Adcock and the victim had been drinking beer earlier in the night, they began drinking the moonshine. When Adcock began flirting with the lead singer of the band, the victim got upset, and she and Adcock began to argue. Around 11:30 p.m., the band stopped playing, and Adcock and the victim walked to their campsite, and Jernigan drove Adcock's motorcycle to the campsite because Adcock was too intoxicated to drive it himself. Jernigan then walked back and joined Adcock and the victim as they walked to their campsite. On their way, they approached a group of three women and two men whom they did not know, and the victim, telling the women in that group that it was Jernigan's birthday, convinced two of the women to flash their breasts. At that point, Adcock showed the women his tattoo, which was located in his genital area, and one of the women "grabbed him." The victim told the woman "[n]ot to touch [her] husband[,]" and they exchanged words. The victim stated that no physical fight occurred and that there were no threats from this woman or her group about finding her later or hurting her. Adcock intervened during this verbal altercation, and the victim and Adcock "fuss[ed]" at each other on the way back to the campsite. The victim stated that she never saw the woman from the incident or the people with her again.

When the victim, Adcock, and Jernigan arrived at the campsite, Adcock went inside the tent. The victim said she stayed outside to talk to Jernigan so Adcock would fall asleep because she did not want to fight with him anymore. The victim and Jernigan talked approximately three hours before Jernigan left to sleep in his vehicle and the victim entered the tent she shared with Adcock. Just before Jernigan got in his vehicle to sleep, Adcock came out of the tent and told the victim she needed to go to bed.

The victim stated that when she entered the tent, Adcock began arguing with her again. She told Adcock that he should go back to sleep and that she would leave the event the next morning. Adcock continued to argue with the victim and began making negative comments about her daughter. When the victim tried to put on her boots to leave, Adcock grabbed one of them, refused to give it to her, and informed her she was not going to leave. When the victim reached behind Adcock to get her boot, he grabbed a loaded .22 caliber revolver from his boot and threw it at her, hitting her in the arm. The victim stated that Adcock also had a knife with him that night, although he did not threaten her with it. When the victim tried to reach her boot again, Adcock hit her in the temple with his fist, which "dazed" her. Adcock hit the victim a second time, which left her unconscious. When the victim regained consciousness, she was lying down, and Adcock was on top her and hitting her. The victim was unsure of how many times Adcock hit her while she was unconscious

or how long she was unconscious. She pushed Adcock off of her, crawled out of the tent, and put on her boot. She yelled at Adcock because she was bleeding, but she was unsure if anyone heard her because the area was noisy from the generators on the recreational vehicles parked nearby and the music coming from other tents. She stated that most of the people close to Adcock's tent were asleep at the time that Adcock assaulted her.

The victim woke up Jernigan, told him that Adcock had hit her, and informed him that she was leaving. She stated that Jernigan was only a few feet away from their tent. She said she was sure that Jernigan saw that she was bleeding. Jernigan asked the victim if she was okay, and she said, "No, I'm leaving." When Jernigan tried to get her to stay, she refused. The victim got on her motorcycle and headed to the front gate to leave. However, the security guard at the gate, who noticed that she was bleeding from her nose and mouth, said she was "in too bad of a shape to be riding" and detained her as he called 911. When the police arrived, she told them that Adcock had beaten her and had a gun, and they asked her where Adcock's tent was located. The victim said she thought that Jernigan had walked up to the front gate by that time because when she started having trouble breathing, Jernigan showed the police where Adcock's tent was located.

The victim stated that she was transported by ambulance to the hospital in the early hours of the morning. Jernigan met her at the hospital and told her that he was going to get her truck and a trailer to pick up her motorcycle. She said that Jernigan did not talk to her about what happened, although she saw him talking to an officer at the hospital. While at the hospital, photographs were taken of the victim's bruises on her forehead, nose, eye, cheek and arm, where Adcock had thrown the gun at her, as well as of the blood in her hair. These photographs were entered into evidence at trial. She stated that she also had bruising on her breastbone from the incident.

The victim stated that she was released from the hospital the morning of May 18, 2008. Approximately two days after the incident, the victim reported to the domestic violence division of the police department, where additional photographs of her injuries were taken. These photographs, which were also entered into evidence, showed that she had a black eye, a bruise on her arm, a knot and swelling on her forehead, and a bruise on her left thigh. At trial, the victim identified the .22 caliber revolver that Adcock had thrown at her and the knife that Adcock had in his possession on the night of the incident.

The victim stated that she filed for divorce the Monday after she was released from the hospital and that she testified at Adcock's preliminary hearing shortly thereafter on May 22, 2008. Prior to testifying at the preliminary hearing, she spoke to the victim-witness coordinator in the district attorney's office. She also testified at a court proceeding in early 2011 regarding this case.

Officer Anthony Chandler of the Metropolitan Nashville Police Department testified that he was one of the officers who responded to the call involving the victim at the "Harley Drag" event. Upon arriving at the front gate, he observed the victim, who was upset and crying, lying on the ground and bleeding from her nose and mouth. He also saw that the victim had a knot on her head. After talking to the victim about what happened, Officer Chandler concluded that an assault had occurred. The victim informed the police that Adcock was armed and intoxicated. Officer Chandler and two other officers began looking for Adcock and found the tent with Adcock asleep inside. The officers awakened Adcock, who appeared intoxicated, and arrested him. When the officers took him into custody, they recovered a pocket knife from Adcock's person. Officer Chandler observed what he believed to be blood on the outside entrance of the tent and on a pillow and sleeping bag inside the tent. He also found a .22 caliber Derringer handgun in a sleeping bag at the entrance of the tent.

Officer Chandler said he first saw Jernigan, who was sitting in his parked vehicle asleep, when he and the other officers initially approached Adcock's tent. The officers spoke with Jernigan, who helped them find Adcock's tent. Jernigan told the officers that he knew nothing about the victim's assault and had not heard anyone yelling. When Jernigan told the officers he wanted to check on the victim, they directed him to the front gate. Officer Chandler said he did not observe any injuries on Adcock at the time of his arrest and did not observe any blood on Adcock's hands or clothes. He stated that the other individuals camped close to Adcock's tent appeared to be asleep and that the few people he was able to contact, who were fifteen to twenty feet away from Adcock's tent, had not heard a disturbance. He stated that he did not recall seeing any groups of people partying nearby.

When Officer Chandler went to the hospital to talk to the victim, he saw Jernigan again. He stated that Jernigan was in the room when the victim gave him a detailed statement regarding the incident and that he had Jernigan sign a domestic violence supplement form at the hospital. Officer Chandler said Jernigan never indicated that the victim's statement to him was not true, that he did not believe the victim's allegation, or that he believed someone else had assaulted the victim. He remembered Jernigan stating, "I can't believe I didn't hear it." Officer Chandler asserted that just because Jernigan did not hear the assault did not mean that the assault had not occurred. He acknowledged that there were no witnesses to the assault other than the victim and Adcock.

Officer Thomas Smith of the Metropolitan Nashville Police Department testified that he also responded to a domestic violence call at the racetrack on May 18, 2008. Upon his arrival, he noticed that the victim had a swollen face and blood coming from her nose. He remembered that the victim had to show the officers where Adcock's tent was located and that he and the other officers encountered Jernigan in a vehicle close to Adcock's tent.

Officer Smith stated that when they arrived at Adcock's tent, Adcock was asleep as were all of the people camping nearby. He stated that he did not recall any other parties going on at 4:00 a.m., the time that he arrested Adcock. He acknowledged that the only person who indicated that Adcock was responsible for the assault was the victim.

Joshua Jernigan, a former Marine, testified that he had known Adcock his entire life and that his mother and Adcock were friends. Jernigan said he parked his vehicle approximately ten feet away from Adcock's tent the night of the event. When he and Adcock offered the lead singer in the band some moonshine, the victim angrily confronted the singer, but there was no physical altercation between the women. He said the victim later pushed Adcock out of the way near the stage because she was angry with him. After the band stopped playing, he drove Adcock's motorcycle back to the campsite because Adcock was too intoxicated to drive it back himself. Jernigan walked back to Adcock and the victim and saw that they were near another group of people. He stated that a confrontation occurred between the victim and a woman in this other group after Adcock showed one of the women his tattoo. Jernigan stated that the victim behaved "very aggressiv[ely]" toward the woman, and the victim and the woman were "hollering and cussing, fixing to get into a little brawl there. And then the other [five or six] ladies who [were] friends with the lady that was involved in it, they all, kind of, started hollering and cussing . . . ." Jernigan stated that he and Adcock split up the confrontation, and this group went on their way. He acknowledged that Adcock and the victim were arguing with one another after this incident and that his goal was to keep Adcock and the victim from getting in a physical confrontation.

Jernigan said that he, Adcock, and the victim walked to the top of the hill where Adcock's tent was located. Adcock went inside the tent to sleep, and Jernigan and the victim sat in chairs in front of the tent and talked for a couple of hours. Jernigan said that when he decided to go to bed, there was a party going on approximately fifty feet away because he could hear the music playing and could see the shadows of people dancing beyond a van. The victim asked him if he wanted to go to the party. When he declined, the victim walked in the direction of the party. At that point, defense counsel asked Jernigan if he knew where the women who were involved in the earlier incident over the tattoo were, and he stated that he thought they were at the party the victim walked toward, but he was not sure. Jernigan said he got into in his vehicle with the passenger window down and tried to sleep. He explained that he put the window down because he did not want the victim coming back and getting into a fight with Adcock.

Approximately thirty minutes later, Jernigan "heard a disturbance behind [his] truck." He stated, "I got out to see what it was. And it was [the victim] trying to leave on her bike. And I took the keys out of her bike [and] told her she was not leaving on it." He stated that the victim was not injured at this time and that this was the first time he had seen her since

she had walked in the direction of the party. He said the victim never informed him that she had been beaten or hurt by Adcock. Jernigan said he took the victim's keys because she was intoxicated at the time, and he did not want her to ride on the road and get hurt. The victim sat there for a minute before telling him that she had to use the restroom. She walked down to the bottom of the hill in the opposite direction of the party, and Jernigan returned to his vehicle. Jernigan said that he did not see the victim again until the police knocked on his window, and he observed that the victim had been injured. He said that he never saw Adcock come out of the tent, that he never heard a fight coming from the direction of Adcock's tent, and that the only disturbance he heard was when the victim attempted to leave on her motorcycle. He talked to the officers, and they asked him to drive the victim to the top of the hill where the ambulance was going to arrive. On the way, Jernigan asked the victim where her motorcycle was located, and she told him that it was at the front gate. Jernigan stated that he did not know how she had gotten her motorcycle there, since he had taken her key. He later retrieved the victim's motorcycle and went to the hospital to check on her.

Jernigan said that when the police arrived with the victim he could see that the victim was "[b]eaten and bloodied up pretty good. Still intoxicated. Just pretty bad." He said he did not believe that a fight or brawl could have occurred in Adcock's tent without him hearing it because he was only a few feet away. He also said he did not know who injured the victim; however, he asserted that he never saw Adcock hurt the victim. Jernigan stated that the only weapon he had seen in Adcock's possession was a .32 caliber Russian semi-automatic pistol and that he had never seen Adcock with the .22 caliber revolver found in the tent the night of his arrest.

Jernigan acknowledged that he was present when the victim spoke to an officer about what happened but asserted that he did not pay attention to what she had said because he was talking to another officer. He also acknowledged that he had been falling in and out of sleep that night because noises kept awakening him. However, he said he had not yet fallen asleep when he heard the victim trying to get on her motorcycle. He admitted that motorcycles had been driving through the campsite all night but claimed that they were idling through the area so as not to disturb anyone. Jernigan admitted that he knew Adcock had been charged with assaulting the victim shortly after Adcock's arrest. He also admitted that he had been in contact with Adcock's family after his arrest and had talked to Adcock once on the phone while he was in jail. He said that he stayed in touch with Adcock after his arrest and that his mother and Adcock were very close. Jernigan stated that he was not aware that Adcock had a preliminary hearing and that he had not testified at Adcock's preliminary hearing. He maintained that it was not possible for Adcock to have assaulted the victim, but he acknowledged that Adcock had been angry with the victim the night of the assault.

Penny Mosier, Adcock's aunt, stated that the victim occasionally stayed with her when the victim and Adcock were "spatting." She asserted that the victim did not have a reputation for honesty and truthfulness and that she had personally observed the victim failing to tell the truth. However, Mosier was unable to give specific instances where the victim had been dishonest and asserted only that the victim often declined to talk to her about her marital problems with Adcock.

**Sentencing Hearing.**  At the beginning of the hearing, the State introduced three warrants charging Adcock with domestic violence, one warrant charging him with assault on a police officer, and one warrant charging him with evading arrest. In addition, the State introduced certified judgments for Adcock's convictions for resisting arrest and driving while intoxicated and introduced photographs depicting the victim's injuries from the assault in this case. The State informed the trial court that on March 5, 2010, Adcock was charged with domestic assault on an individual other than the victim.

The victim testified that she had dated Adcock for several years before they were married. Following this incident, she filed for divorce from Adcock and ultimately agreed to several of Adcock's demands in order to bring the divorce to a close. The victim stated that prior to the incident in this case, Adcock had committed several other assaults. On March 9, 2006, she saw Adcock push his daughter. When the police served the arrest warrant on Adcock for assaulting his daughter, he fought with the police. Although Adcock was charged with assaulting his daughter, assaulting a police officer, and resisting arrest regarding this incident, he pled guilty to three counts of resisting arrest, and the remaining charges were dismissed.

On August 11, 2006, the victim stated that Adcock knocked her unconscious, and she was taken to the hospital. She said that when the police first arrived, there was blood on her face, on the kitchen table and floor, and on two telephones in the house. As a result of this assault, she received a laceration above her ear and an injury to her mouth. Adcock was charged with domestic assault, but the charge was later dismissed because she did not pursue the case. She stated that Adcock was charged with evading arrest when the arrest warrant for the August 11, 2006 domestic assault was served on him.

On December 30, 2004, Adcock returned from his grandmother's funeral upset, and he began drinking. When she and Adcock later got into an argument, he began "beating on" her and "throwing [her] around." The victim said that when the police arrived, they noticed scratch marks on her face and a knot on her head and charged Adcock with domestic assault. Because she did not pursue this charge, it, too, was dismissed.

The victim said that Adcock had assaulted her on other occasions, although no charges were ever brought against him. Sometime in 2005, Adcock slapped her in the mouth while they were driving back from Huntsville. The victim stated that Adcock had hit her in the past, and she had not pressed charges because she loved him. The victim said that she decided to press charges against Adcock in this case and had testified against him in two trials because the first trial had resulted in a hung jury. The victim said that Adcock admitted to her that he had beaten a man in Wilson County with a metal baseball bat. She did not believed that Adcock was ever convicted of this offense. In addition, she stated that Adcock admitted that one of his ex-wives was "mouthy," had cheated on him, and that he "beat her."

The victim read a prepared statement during the sentencing hearing. In it, she stated that Adcock had injured her several times and that Adcock's aggressive behavior had negatively affected her children because they had observed his abuse firsthand. She said that her daughter did not trust men after witnessing Adcock's assaults on her. The victim stated that Adcock had taken away her money, house, and pride and had prevented her from trusting other people. She asked the court to impose the maximum sentence for Adcock so that he would not injure any other women.

The defense introduced a letter from the Wilson County Circuit Court Clerk stating that there were no records for two of Adcock's convictions, the March 5, 2010 domestic assault and the November 16, 2009 offense. The State asserted that it would not object to Adcock showing that these charges had been expunged. In addition, the defense introduced a letter from one of Adcock's ex-wives, Deanna Casteal, who stated that she and Adcock were married for six years and had been friends for thirty-three years and that Adcock never behaved aggressively toward her during their marriage.

Kenneth A. Stacey testified that he first met Adcock at work and had known him for fifteen years. He said that Adcock owned his own business, Pride Machine, and also worked at Haskell Steel. Stacey stated that Adcock was a reliable, hard worker and a loyal friend. He also stated that Adcock had ridden his motorcycle in several charity bike rides and had grown out his hair to donate it to charity.

William Ray Adcock, the Defendant-Appellant's cousin, testified that his cousin was "a good man" and "a hard worker" with "a big heart." He stated that his cousin had sponsored little league teams for him and had stayed with him and his ailing mother for two weeks while his mother was receiving hospice care. He also stated that his cousin had donated his hair to Locks of Love, a charity for children with cancer. He said Adcock had helped him out many times in the past and had ridden his motorcycle in numerous charity rides. He stated that he believed his cousin could be rehabilitated to be a productive member of the community.

-8-

At the conclusion of the sentencing hearing, the trial court sentenced Adcock to eleven months and twenty-nine days in the county jail. On July 12, 2012, Adcock filed a motion for a reduction of his sentence, a motion for new trial, and a notice of appeal. On November 13, 2012, Adcock filed an amended motion for new trial. On November 28, 2012, the trial court entered an order denying the motions for new trial.

## ANALYSIS

**I. Failing to Rule on Objection.** Adcock argues that the trial court erred in failing to rule on his objection when the State asked Joshua Jernigan if he had testified at Adcock's preliminary hearing. Specially, he claims that the court's failure to rule on the objection "gave the impression there was no merit to the objection." The State responds that Jernigan answered the question before the court had an opportunity to rule on the objection and that defense counsel failed to make a motion to strike the testimony. The State also asserts that Adcock failed to establish that Jernigan's testimony should have been excluded as irrelevant.

During cross-examination, the State asked the following questions of Jernigan:

Q.      Were you in contact with Mr. Adcock after he was arrested?

A.      His family I was, yes, sir.

Q.      His family and you were; right?

A.      Yes, sir.

Q.      Did you go visit him wherever he was?

[Defense Counsel]:      Objection, relevance.

[The State]:      Judge, it is totally relevant.

The Court:      You can ask if he visited, yes.

The Witness:      No, I didn't.

Q.      You didn't. Did you speak to him on the phone?

A.      Once.

-9-

Q.      Okay. Were you aware of the fact that he had an upcoming preliminary hearing?

A.      No.

Q.      You weren't?

A.      No.

Q.      Nobody talked to you about that?

A.      No.

Q.      You stand before this jury today to say that there is no way your friend, Morris Wayne Adcock, could have done these things; right?

A.      (Responds in the affirmative).

Q.      And the truth is the truth and it never changes; fair to say?

A.      Yes, sir.

Q.      So, you must have felt strongly that way right when he got arrested?

A.      Yes, sir.

Q.      It's not something you've developed over time; is it?

A.      No, sir.

Q.      Did you go testify at his preliminary hearing?

[Defense Counsel]:      Objection to relevance, Your Honor.

The Court:      Well, either he testified or he didn't.

[Defense Counsel]:      Your Honor, there are many reasons why a person would or would not be called from an attorney's point of view, and that would not be probative of his testimony today.

-10-

| The Court: | Right. I understand that. |
|---|---|
| [The Witness]: | No, sir. |

We agree with the State that the court was unable to rule on the defense's objection prior to Jernigan's response that he had not testified at the preliminary hearing. In any event, it is clear that the prosecutor was attempting to discredit Jernigan's testimony by establishing that he failed to appear at his preliminary hearing. Although we agree that Jernigan's presence at the preliminary hearing was of marginal relevance, we fail to see how the above exchange was prejudicial in light of the facts and circumstances of this case. Accordingly, Adcock is not entitled to relief on this issue.

**II. Prosecutorial Misconduct.** Adcock argues that the prosecutor's "continuing pattern of misconduct" compromised his due process right to a fair trial. He references specific comments made by the prosecutor and claims that these comments were so prejudicial that he is entitled to a new trial. The State responds that Adcock has failed to establish that the prosecutor's statements were so improper as to affect the outcome of his trial. After reviewing the record, we conclude that although some of the prosecutor's comments were improper, they were not so egregious that they affected the jury's verdict to Adcock's detriment.

Prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. State v. Bush, 942 S.W.2d 489, 516 (Tenn. 1997).

The Tennessee Supreme Court has consistently held that "'closing argument is a valuable privilege that should not be unduly restricted.'" State v. Reid, 164 S.W.3d 286, 320 (Tenn. 2005) (quoting Bane, 57 S.W.3d at 425); see State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Closing argument gives each party an opportunity to persuade the jury of their theory of the case, see 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), and to highlight the strengths and weaknesses in the proof for the jury. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008) (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable

inferences to be drawn from the evidence, United States v. Mullins, 446 F.3d 750, 759 (8th Cir. 2006), or make derogatory remarks or appeal to the jurors' prejudices, State v. Reid, 164 S.W.3d at 320-21." Banks, 271 S.W.3d at 131. Moreover, we recognize that "[c]losing arguments in criminal cases have a 'rough and tumble quality' about them, State v. Skakel, 276 Conn. 633, 888 A.2d 985, 1060-61 (2006), because they are traditionally the one place in the trial where the lawyers are given the greatest leeway in their manner of expression." Banks, 271 S.W.3d at 131 (citing 6 Wayne R. LaFave et al. Criminal Procedure § 24.7(b), at 456-57 (3d ed. 2007)).

Notwithstanding this leeway, a prosecutor's comments during closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Additionally, a prosecutor's duty to uphold justice necessarily limits the leeway given to him or her in closing argument:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor–indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. U.S., 295 U.S. 78, 88 (1935).

This court has recognized that there are five general categories of prosecutorial misconduct:

1.      It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing American Bar Association, Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

In determining whether the prosecutor's improper conduct could have affected the verdict to the prejudice of the defendant, this court should consider the following factors:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
2. The curative measures undertaken by the court and the prosecution.
3. The intent of the prosecutor in making the improper statement.
4. The cumulative effect of the improper conduct and any other errors in the record.
5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see Goltz, 111 S.W.3d at 5-6. Adcock argues that all five Judge factors show that the prosecutor's comments affected the verdict to his prejudice.

-13-

**A. The Prosecutor's Question to Joshua Jernigan.** In connection with his first issue, Adcock argues that the prosecutor's question to Joshua Jernigan, about whether he testified at Adcock's preliminary hearing, constituted an improper vouching for the credibility of the victim and implied that Adcock was guilty by referencing his preliminary hearing. Here, we conclude that Adcock has waived this issue because he objected to the prosecutor's question on the ground of relevance rather than on the ground of prosecutorial misconduct. A party on appeal is bound to the ground of the objection it asserted at trial. See State v. Schiefelbein, 230 S.W.3d 88, 129 (Tenn. Crim. App. 2007) (citing State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994); Tenn. R. Evid. 103(a)(1)). Accordingly, Adcock is not entitled to relief on this issue.

**B. The Prosecutor's Comments Unobjected to By the Defense.** Adcock also asserts that several statements made by the prosecutor during his rebuttal closing argument constituted prosecutorial misconduct even though they were not objected to by the defense. In response, the State asserts that Adcock has waived these issues because he failed to make a contemporaneous objection at trial.

In his brief, Adcock argues that the prosecutor improperly vouched for the victim's credibility and personally commented on the veracity of the other witnesses when he made the following statements in his rebuttal closing argument:

1. "We'll talk about everything that an individual has to go through, including Ms. Adcock, to see a matter like this through. She is consistent about material facts[,] and there is no big lie in this case."

2. "Joshua Jernigan, I think, in a total baseless way, said he believed that [the people responsible for the victim's assault were] the women that they had contact with in the tattoo incident earlier that day, but he doesn't know for sure. I don't know why he would even say that. Because, apparently, all he saw was shadows and heard music. Says that [the victim] said she's going off to party. And then she comes back and is trying to get on her motorcycle and go uninjured."

3. "[The victim] did testify that she spoke with the victim witness coordinator, a stranger. She testified that she testified at the preliminary hearing. Didn't know anybody there. She testified, again, in January of 2011 to fourteen different strangers. Over, and over again, folks.

-14-

Now, she stands before fourteen final strangers for days of this jury trial that takes place–that's not right–about four years after the fact.

Six occasions she's talking about [the incident of] domestic abuse [in this case].

Remember the one juror who made it in here, I thought had extensive personal experience with domestic violence, being a domestic violence survivor, was floored that no one seemed to think that it was a h[]ard thing to do to accuse someone who's abusing you.

She's disclosed it numerous times to people she doesn't know. She's suffered separation from her prized motorcycle, went to the hospital. Four years. That's a lot of work. When the divorce is done, ladies and gentlemen, when there is no more contact, that's a lot of work, just in the hope that you can recognize her as a victim who deserves justice in this case."

4.     "And all of that off-colored stuff, y'all, is leading up to the moment that we have to live in as we analyze the case. The moment where interaction between that man and my victim turned violent. The moment where she was struck with a thrown pistol, the moment where his fists hit her face. That's the moment that's important. Don't get lost in the lead up."

Adcock also argues that "the prosecutor made numerous prefatory statements to set up his rebuttal argument," which included the following:

"So, what do you do [for a defense theory]? You abuse the plaintiff. And for those of you who made it–I suppose there have got to be a few who were civil jurors at one time. You have plaintiff and defendant in a civil case. You've got the State and the defendant in a criminal case. The State, generally, and its witnesses could be considered the plaintiff. And [defense counsel] has tried his best to cast Government, police and the State's victim in a negative light."

. . . .

"All right. And why should you believe [the victim]? How did she disclose this whole thing? I mean, if she's lying, then there's got to be a

-15-

reason, right? Why is she lying about this? And we'll talk about how many times she's had to come to Court and stand up to the person who's committed a crime against her. But why would she do this? The woman scorned defense, I suppose; that–I don't even know. She filed for divorce. There was a lot of talk earlier about divorce this and divorce that, and then that, kind of, evaporated. The proof was, uncontradicted, that she just acquiesced [to Adcock's demands in the divorce] in the end to be done with it."

Adcock argues that these "prefatory" comments "place[d] the police[,] the prosecutor[,] and the victim in a cohesive position of trustworthiness and justness in the cause." In addition, he asserts that the prosecutor made additional comments, highlighting the fact that the victim had never met the security guard, police officers, emergency medical technicians, hospital staff, and members of the district attorney's office before she told them about the details of her assault, which also bolstered the victim's credibility.

As an initial matter, we agree with the State that the defense's failure to make contemporaneous objections to the aforementioned comments at trial amounted to waiver of these issues. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1). However, in his motion for new trial and his amended motion for new trial, Adcock averred that the prosecutor engaged in "improper closing argument in both visual, written and verbal form, thereby committing prosecutorial misconduct, by expressing his personal belief and opinion, the opinion of the office of the District Attorney Gerneral and of the investigating agency, the Metropolitan Police Department as to the truth, veracity and credibility of [the victim]." While his motion for new trial only generally cites to the beginning page of the "transcript of closing statements," we conclude that these issues have been properly preserved for appellate review. State v. Frazier, 683 S.W.2d 346, 351-352 (Tenn. Crim. App. 1984).

In regard to this issue, we begin by recognizing that a defendant's failure to object to a prosecutor's comments during closing argument rarely results in a reversal of the conviction. The Tennessee Supreme Court has stated:

> Unobjected to closing arguments warrant reversal only in exceptional circumstances. United States v. Smith, 508 F.3d 861, 864 (8th Cir. 2007). Accordingly, like the United States Court of Appeals for the Eighth Circuit, "[w]e bear in mind that fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers." United States v. Mullins, 446 F.3d at 758.

Banks, 271 S.W.3d at 132 n.30. As an initial matter, in our view, none of the above comments were improper. Moreover, the trial court instructed the jury that arguments of counsel were not evidence, which was reiterated during the State's rebuttal closing argument. Furthermore, after viewing the prosecutor's conduct under the factors outlined in Judge, we are unable to conclude that any of the prosecutor's above comments affected the verdict to Adcock's prejudice. Adcock is not entitled to relief on this issue.

**C. The Prosecutor's Comments Objected to by the Defense.** Third, and most importantly, Adcock claims some of the prosecutor's comments, to which he did object during the State's rebuttal closing argument, amounted to an improper vouching for the credibility of the State's witnesses, the second category of prosecutorial misconduct under Goltz. During rebuttal closing argument, the prosecutor asserted that the defense's plan was to try to cast the victim in a negative light and claim that there was a lack of evidence presented by the State at trial. The prosecutor then discussed whether the defense's allegation that the victim was lying about Adcock assaulting her was a reasonable one. He noted the numerous times the victim had come to court to face her ex-husband regarding these charges. He also talked about the fact that the victim did not call the police following the assault and that the handgun she told police Adcock threw at her was found in his tent. The prosecutor continued:

> [A] theme of the defense is, does that support or contradict [the victim's story]. In opening statement, [defense counsel] said that there won't be one thing that supports [the victim's] story, the State's theory of the case. "You're not going to hear one thing that supports it." Ladies and gentlemen, that was not accurate.
>
> So, [the victim] goes to the security guard, she[] goes to Mr. Jernigan. And I'll talk about Mr. Jernigan getting up, staying in his car, or whatever. But, then, she goes, encounters security and they say, "Look you need help." They call an ambulance and she's taken to the hospital.
>
> In the process she has convinced police, security guards, everyone who has come in contact with her that–

[Defense counsel]:    Your Honor, I must object at this time. May I be heard by the Court?

The Court:    Objection to what?

[Defense counsel]: Object to the words that are on the screen at this time, which need to be placed into the record, which places forward an indication that the prosecutors believe [the victim's] story, which is totally improper and inappropriate in this closing argument and against the rules of evidence.

[The State's PowerPoint presentation slide that was being shown at the time of the defense's objection stated the following: "If she's not telling the truth, she's put on one heck of a performance–effectively fooling police and prosecutors with the sophistication of a CIA field operative–just to hurt Morris Adcock."

[The State]: Judge, if I may respond, I would like to.

In opening statement–number one, first and foremost, it's the same slide that existed, that [defense counsel] has seen before, through no objection. Number two, in opening statement the defense stood and said, "If you believe, as I do, that someone is telling a lie," and now here we stand.

The Court: Well, just let me simply say this: This is closing argument. This is not proof in the case. This is not evidence. It is closing argument, that's all it is. Take it for what it is.

[Defense counsel]: Your Honor, following your ruling, can we make sure after this trial that this, what has been shown to the jury, is placed into the record, please?

The Court: Sure.
[Defense counsel]: Thank you, very much.

[The State continued its rebuttal closing argument]:

Mr. Adcock was arrested and charged in this case. Don't think the police would do that unless they felt they had cause to do so. Don't think–I mean, maybe, you believe that we come here and try cases just to try cases. I don't know. Anyway.

People are helping [the victim] and the process is going forward representing the interest of [the victim] because there is a belief that this is a case that needs addressing.

[Defense counsel]:   Judge, I renew my objection on the same grounds. He's continuing this inappropriate argument.

[The State]:        I will withdraw the statement, Judge.

The Court:         Okay, please.

                   All right.

[The State]:        Would you like me to put it in the record now, [defense counsel]?

[Defense counsel]:   I will object when it's necessary, Counsel.

[The State]:        Okay.

[The State continued its closing argument]:

If [the victim's] not telling the truth she has put on one heck of a performance. She has manipulated, schemed, behaved with the sophistication of a spy. The slide says "CIA field operative." What-have-you. She's behaved with great sophistication just to hurt Morris Adcock. Is that what you see going on here?

The slide in issue remained on the jurors' screens for approximately three-and-a-half minutes and the State's rebuttal closing argument lasted approximately fifty minutes. The record shows that the defense never renewed its objection when the prosecutor paraphrased the information that was on the slide originally objected to by the defense. For this reason, the State understandably asserts that the defense failed to specifically renew its objection to this last statement. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1). In our view, however, the prosecutor referred back to the slide and argument to which defense counsel originally objected. Accordingly, this issue is properly preserved for review.

In regard to this issue, Adcock argues on appeal that following the "inflammatory statements and objection of Counsel, the Court fail[ed] to address the objection of the Defendant, and fail[ed] to explicitly address the clear misconduct of the prosecutor, leaving

-19-

the impression [that] there was no merit to the complaint." He also argues that the trial court never gave a curative instruction following the defense's objections. In addition, he contends that the prosecutor "only bolster[ed] the previous objectionable material [on the State's PowerPoint presentation slide]" when he paraphrased the statement on the slide later in his closing argument. Moreover, Adcock asserts that the trial court erred in denying his motion for new trial on the issue of whether the State had committed prosecutorial misconduct. He claims that court erroneously denied his motion by making the following "single sweeping statement":

> The Court: All right [sic], thank you both. I remember this case quite well. We did try it twice. Mr. Adcock was indeed convicted of simple assault[,] and the Court believes that all matters were proper. As such, the motion for new trial is respectfully denied. Next Motion?"

He claims that the evidence preponderated against the court's finding at the motion for new trial hearing that "all matters were proper."

As previously noted, in determining whether a prosecutor's conduct could have affected the verdict to the prejudice of the defendant, this Court must consider the factors as outlined in Judge. Viewing the prosecutor's conduct in the context and in light of the facts and circumstances of the case, we note that the defense consistently challenged the victim's credibility throughout the trial. During its closing argument, the defense suggested that the biker ladies, with whom the victim had a verbal altercation after Adcock showed his tattoo, were responsible for the victim's injuries rather than Adcock. Although it was undisputed that the victim had a verbal altercation with these women earlier in the night, there was absolutely no evidence presented that the victim had come in contact with these women later or that these women were in fact responsible for her injuries. The defense also pointed out the discrepancies in the State's proof and asserted that the State could have presented witnesses to show the victim's reputation for truthfulness and failed to do so. It is clear that the comments Adcock complains of during the State's rebuttal closing argument stemmed from the prosecutor's attempt to rebut the defense's challenges to the victim's credibility.

The State acknowledges that some of the prosecutor's comments were not "entirely proper" but argues that "there was no showing that the prosecutor intentionally engaged in misconduct or that the comments were egregious when viewed [in] the context of the entire trial and closing arguments as a whole." We agree. Significantly, the trial court provided the jury with the following instruction at the time of Adcock's first objection during the State's rebuttal closing argument: "Well, just let me simply say this: This is closing argument. This is not proof in the case. This is not evidence. It is closing argument, that's

-20-

all it is. Take it for what it is." The court also cautioned the jury in its general charge that arguments of counsel are not proof, stating: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." We note that a jury is presumed to follow a trial court's instructions. Banks, 271 S.W.3d at 134 (citing State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006); State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001)). Moreover, when the defense counsel objected to the prosecutor's statement that the police would not have arrested and charged Adcock unless they had cause to do so, the prosecutor offered to strike his statement in the record, but defense counsel stated only that he would object when it was necessary, arguably waiving any issue regarding this second comment. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1).

In addition, when looking at the record as a whole, we conclude that the prosecutor's intent in making these comments was to respond to the defense's allegations that the victim was not telling the truth about Adcock assaulting her. In order to counter the defense's claims of the victim's dishonesty, the prosecutor reminded the jury that the victim had consistently told her version of the events to a series of individuals from the beginning of this case. Regarding the cumulative effect of the improper conduct and any other errors in the record, we have already concluded that the clear majority of the other comments, unobjected to by the defense, were rather innocuous. The comments of greatest significance, which will be more fully discussed below, were limited to the content on the prosecutor's PowerPoint slide and his statement that police would not have arrested Adcock and the district attorney's office would not have tried this case if they did not have cause to do so. Finally, regarding the relative strength or weakness of this case, we note that although the proof of Adcock's guilt was not overwhelming and his first trial had resulted in a hung jury, there was substantial circumstantial evidence presented in this trial that corroborated the victim's claim that Adcock was responsible for her assault.

We view the prosecutor's comments in this case as similar to those made by the prosecutor in State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). In Thornton, we held that the prosecutor's comment that the Tennessee Bureau of Investigation's crime laboratory did an excellent job was inappropriate but not reversible error:

> It is a violation of the Code of Professional Responsibility, DR 7–106(C)(4) for lawyers engaged in trial to express their personal opinion about any issue involved in the justice of the cause they represent. See State v. Hall, 976 S.W.2d 121 (Tenn.1998). Certainly, a lawyer should not assert his or her personal opinion as to the credibility of a witness, or as to the accused's guilt or innocence. State v. Henley, 774 S.W.2d 908, 911 (Tenn.1989). Whether

a statement qualifies as misconduct often depends upon the specific terminology used. United States v. Stulga, 584 F.2d 142, 147 (6th Cir. 1978) (stating "The use of the words 'submit' are not the equivalent of expressing an opinion."). In this case, the prosecuting attorney essentially vouched for the effectiveness of the crime lab, stating that he was "very proud of our crime lab." He further stated that "[t]hey do an excellent job." There were no prefatory words, such as " submit," or qualifying terms, such as "In my view." Rather, the statement that the crime lab does "an excellent job," qualified as a personal opinion made before the jury and in contravention of the rule. The statements would not, however, constitute reversible error under the Judge test.

In Thornton, just as in this case, the prosecutor's comments did not contain the words "I submit" or "in my view" and represented the prosecutor's personal opinion; therefore, they were improper. Here, rather than highlighting the specific proof that undermined the defense's theory, the prosecutor insinuated that the victim could not have lied about Adcock assaulting her because she had convinced security guards, police, and prosecutors that she was telling the truth. We agree with Adcock that these comments amounted to an improper vouching for the credibility of the victim. However, we acknowledge that these comments were made in response to defense counsel's argument in closing that the victim lied about Adcock being responsible for her injuries. See Goltz, 111 S.W.3d at 6 (courts must consider the facts of each particular case as well as the argument made by defense counsel in determining whether statements are considered prosecutorial misconduct). After applying the Judge factors, we conclude that the prosecutor's comments did not have a prejudicial effect on the jury's verdict. Although the prosecutor should not have vouched for the credibility of the victim, we conclude that these two comments, while improper, were not so egregious as to affect the outcome of Adcock's trial, especially in light of the trial court's initial curative instruction and general instruction that arguments of counsel were not evidence. See Banks, 271 S.W.3d at 131; Farmer, 927 S.W.2d at 591.

**III. Cumulative Error.** Adcock argues that he is entitled to relief based on the cumulative effect of the aforementioned errors. In response, the State asserts that because Adcock failed to establish any actual errors, he cannot establish cumulative errors entitling him to relief. We agree that Adcock is not entitled to relief based on cumulative errors.

Initially, we note that although the United States Constitution and the Tennessee Constitution grant the right to a fair trial, they do not grant the right to a perfect trial. State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000) (citing State v. Smith, 755 S.W.2d 757, 765 (Tenn. 1988)). The Tennessee Supreme Court recently defined the doctrine of cumulative error:

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). The Hester court also found that United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993), provided helpful insight regarding the cumulative error doctrine. Hester, 324 S.W.3d at 77. In Sepulveda, the United States Court of Appeals for the First Circuit provided guidance for appellate courts when considering whether the aggregated errors at trial deprived a defendant of a fair trial:

Of necessity, claims under the cumulative error doctrine are sui generis. A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy–or lack of efficacy–of any remedial efforts); and the strength of the [State's] case. See, e.g., [U.S. v.] Mejia-Lozano, 829 F.2d [268,] 274 n.4 [(1st Cir. 1987)]. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

Sepulveda, 15 F.3d at 1196.

Upon review, we conclude that the prosecutor's improper statements did not "have a cumulative effect on the proceedings so great as to require reversal in order to preserve [Adcock's] right to a fair trial." Hester, 324 S.W.3d. at 76. Accordingly, Adcock is not entitled to relief on this issue.

**IV. Excessive Sentence.** Adcock argues that his sentence is excessive. Specifically, he asserts that the trial court failed to consider the purposes and principles of the sentencing act as stated in Tennessee Code Annotated sections 40-35-102 and 40-35-103 and improperly held that the factor in Code section 40-35-103(1)(B), that confinement was necessary to avoid depreciating the seriousness of the offense or was particularly suited to provide an effective deterrence to others likely to commit similar offenses, outweighed all other factors. In addition, he contends that he was a favorable candidate for alternative sentencing because his criminal history only consisted of two Class B misdemeanors and because measures less restrictive than confinement had not been frequently or recently applied unsuccessfully to him. See T.C.A. § 40-35-103(1)(A), (C). He also argues that his faithful compliance with

-23-

the conditions of his bond for four years while his case was pending further indicates that he would be amenable to rehabilitation. The State responds that Adcock is not entitled to relief because the trial court considered the relevant sentencing factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act. We agree with the State.

Recently, the Tennessee Supreme Court concluded that a trial court's sentencing determinations in felony cases should be reviewed under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Shortly thereafter, the Tennessee Supreme Court applied the abuse of discretion standard, accompanied by a presumption of reasonableness, to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). To date, the Tennessee Supreme Court has not addressed whether the abuse of discretion standard to misdemeanor sentencing. However, because our court has consistently applied the abuse of discretion standard with a presumption of reasonableness to misdemeanor sentencing cases, we will do so in this case. See State v. Robert Joseph Harr, No. W2011-02735-CCA-R3-CD, 2013 WL 5422801, at *6 (Tenn. Crim. App. Sept. 27, 2013); State v. Dustin A. Hubman, No. E2012-01569-CCA-R3-CD, 2013 WL 3462738, at *2 (Tenn. Crim. App. July 8, 2013), perm. app. denied (Tenn. Sept. 10, 2013); State v. Michael Glen Walsh, No. E2012-00805-CCA-R3-CD, 2013 WL 1636661, at *4 (Tenn. Crim. App. Apr. 17, 2013).

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or

treatment. See id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

Adcock argues that the trial court erred in refusing to grant some form of alternative sentencing. We note that any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). T.C.A. § 40-35-102(6)(D). A trial court should consider the following when determining whether there is "evidence to the contrary" indicating that an individual should not receive alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Here, Adcock was convicted of a Class A misdemeanor, which carries a maximum sentence of eleven months and twenty-nine days. See T.C.A. § 40-35-111(e)(1). An individual convicted of a misdemeanor has no presumption of entitlement to a minimum sentence. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citing State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997); State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994)). Sentences for misdemeanor offenses must be specific and in accordance with the principles, purpose, and goals of the Criminal Sentencing Reform Act of 1989. T.C.A. §§ 40-35-104, -302. The sentencing court is granted considerable latitude in misdemeanor sentencing. Johnson, 15 S.W.3d at 518 (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)). While a separate sentencing hearing is not mandatory in

misdemeanor cases, the court must provide the defendant with a reasonable opportunity to be heard regarding the length and manner of the sentence. See T.C.A. § 40-35-302(a).

"[A] misdemeanor offender must be sentenced to an authorized determinant sentence[,]" and "a percentage of that sentence, which the offender must serve before becoming eligible for consideration for rehabilitative programs, must be designated." State v. Palmer, 902 S.W.2d 391, 394 (Tenn. 1995). Typically, a percentage not greater than seventy-five percent of the sentence should be fixed for a misdemeanor offender; however, an individual convicted of DUI may be required to serve 100% of his or her sentence. Id. at 393-94; T.C.A. § 40-35-302(d). Because no percentage was expressed in Adcock's judgment, his percentage is zero percent. T.C.A. § 40-35-302(d).

Here, the trial court held that an alternative sentence would not serve as a deterrence to Adcock based on his prior criminal conduct and would not serve the interests of the public or the defendant. In addition, the court found that Adcock had "some serious anger issues," as shown by "his prior criminal behavior, not necessarily his criminal convictions, because he has few." The court noted that Adcock had been charged several times with assault and domestic assault. In addition, the court considered the circumstances of this offense and the photographic proof that the victim had been "beaten severely." It also held that Adcock was not amenable to rehabilitation based on the proof at trial and his history of criminal behavior. The court primarily relied on Code section 40-35-103(1)(B), that confinement is necessary to avoid depreciating the seriousness of the offense and is particularly suited to provide an effective deterrent to others likely to commit similar offenses, to deny an alternative sentence before sentencing Adcock to eleven months and twenty-nine days in the county jail. We note that the record also supports the application of Code section 40-35-103(1)(A) because Adcock had a long history of criminal conduct, which consisted not only of his two convictions for resisting arrest and driving while intoxicated but also of multiple charges for domestic assault, assault, and evading arrest. Because the criminal court sentenced Adcock within the appropriate range for the domestic assault conviction and because the sentence reflected the trial court's proper application of the purposes and principles of the Sentencing Act, we conclude that the trial court did not abuse its discretion in imposing a sentence of eleven months and twenty-nine days in confinement.

**CONCLUSION**

Upon review, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE